United States Court of Appeals
Fifth Circuit
**F I L E D**

**July 6, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 04-10245

IN RE: YOKAMON LANEAL HEARN,

Movant.

No. 04-70010

YOKAMON LANEAL HEARN,

Petitioner-Appellant,

v.

DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee.

Transfer Order from the United States District
Court and Appeal from the United States District Court
from the Northern District of Texas
(No. 3:04-CV-450)

Before HIGGINBOTHAM, SMITH and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Yokamon Laneal Hearn, an indigent Texas inmate seeking to challenge his death sentence

pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), moves this Court to appoint counsel to prepare

1

his application for authority to file a successive federal habeas corpus petition, and to stay his execution pending the disposition of such petition. For the following reasons, the motions to appoint counsel and stay the execution are GRANTED.

## I.

Hearn was convicted of capital murder in Texas and sentenced to death. He appealed to the Texas Court of Criminal Appeals, which affirmed both the conviction and sentence. *Hearn v. State*, No. 73,371 (Tex. Crim. App. Oct. 3, 2001) (per curiam). The Supreme Court later denied Hearn's petition for writ of certiorari. *Hearn v. Texas*, 535 U.S. 991 (2002).

After Hearn was denied state post-conviction relief, *Ex parte Hearn*, No. 50,116-01 (Tex. Crim. App. Nov. 14, 2001), he filed a federal habeas petition pursuant to 28 U.S.C. § 2254 in the United States District Court for the Northern District of Texas. On July 11, 2002, the district court granted summary judgment on behalf of the Director of the Texas Department of Criminal Justice ("Director"), thereby denying Hearn's request for federal habeas relief. *Hearn v. Cockrell*, No. 3:01-CV-2551-D, 2002 WL 1544815 (N.D. Tex. July 11, 2002). Both the district court and this Court denied Hearn's application for a certificate of appealability ("COA"), finding that he had failed to make a substantial showing of the denial of a constitutional right. *Hearn v. Cockrell*, No. 02-10913, 2003 WL 21756441 (5th Cir. June 23, 2003). On November 17, 2003, the Supreme Court denied Hearn's petition for writ of certiorari. *Hearn v. Dretke*, 124 S. Ct. 579 (2003). The State of Texas scheduled Hearn's execution for March 4, 2004.

On March 2, 2004, Hearn filed a successive application for state post-conviction relief, claiming that he is mentally retarded and that his death sentence is cruel and unusual punishment under the Eighth Amendment. *See Atkins v. Virginia*, 536 U.S. 304 (2002). On March 3, 2004, the

2

Texas Court of Criminal Appeals dismissed Hearn's application on the ground that it constituted an abuse of writ, finding that he failed to make a *prima facie* showing of mental retardation. *Ex parte Hearn*, No. 50,116-02 (Tex. Crim. App. Mar. 3, 2004). Later that day, Hearn moved the United States District Court for the Northern District of Texas for appointment of counsel pursuant to 21 U.S.C. § 848(q)(4)(B), and for a stay of execution under 28 U.S.C. § 2251. The district court *sua sponte* transferred the motions to this Court, and Hearn filed a separate notice of appeal—asking us to reverse the transfer order, appoint counsel, and enter a stay of execution.[1] In order to thoroughly address Hearn's claim, we granted a temporary stay of execution, requested supplemental briefing, and heard oral argument.

## II.

A.     Appointment of Counsel

The legality of Hearn's detention was determined on a prior application for a writ of habeas corpus. *Hearn v. Dretke*, 124 S. Ct. 579 (2003). "Before a second or successive application [for a writ of habeas corpus] is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A). In order to facilitate the preparation of his application for § 2244(b)(3)(A) authority, Hearn now moves this Court to appoint counsel pursuant to 21 U.S.C. § 848(q)(4)(B).[2]

---

[1] Hearn's current lawyers, members of the Texas Defender Service, have volunteered their services for the limited purpose of assisting Hearn in his effort to obtain permanent habeas counsel pursuant to § 848(q)(4)(B).

[2] As an initial matter, we decline to characterize Hearn's motion for appointment of counsel as a motion for actual § 2244(b)(3)(A) authority to file a successive federal writ petition. Hearn has made it abundantly clear that he is not asking this Court for such authority, and we are not persuaded that our precedent requires us to presume otherwise. *United States v. Key*, 205 F.3d 773, 774-75 (5th Cir. 2000), cited by the Director, is inapposite because it involves neither

3

(1)     Scope of § 848(q)(4)(B)

The Director contends that § 848(q)(4)(B) does not authorize the appointment of counsel to prepare an application for authority to file a successive habeas writ petition.  We disagree.

Section 848(q)(4)(B) provides that:

> In *any post-conviction proceeding* under section 2254 or 2255 of Title 28, seeking to vacate or set aside a death sentence, any defendant who becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services shall be entitled to the appointment of one or more attorneys and the furnishing of other services in accordance with paragraphs (5), (6), (7), (8), and (9).

21 U.S.C. § 848(q)(4)(B) (emphasis added).  Significantly, this provision expressly incorporates subsection (q)(8), which states that

> each attorney so appointed shall represent the defendant throughout *every subsequent stage of available judicial proceedings*, including pre-trial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and *all available post-conviction process*, together with applications for stays of execution and *other appropriate motions and procedures*, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

21 U.S.C. § 848(q)(8) (emphases added).  On their face, these statutes grant indigent capital prisoners a mandatory right to qualified legal counsel and reasonably necessary legal services in all federal post-conviction proceedings.  Needless to say, this is not language of limitation.[3]

---

21 U.S.C. § 848(q)(4)(B), a capital prisoner, nor the Supreme Court's ruling in *McFarland v. Scott,* 512 U.S. 849 (1994).

[3] The Director argues that we must deny the appointment of counsel on the ground that an application for § 2244(b)(3)(A) certification is not a "post-conviction proceeding under section 2254 or 2255."  This argument is without merit.  Section 2255, for example, provides that motions filed by successor petitioners "must be certified as provided in section 2244."  This clause in effect designates § 2244(b)(3)(A) certification as an element of § 2255 relief.  As a result, we find that a certification inquiry is a proceeding "under" § 2255.  Further, this Court has on prior

The expansive nature of § 848(q)(4)(B) is further evinced by the Supreme Court's decision in *McFarland v. Scott*, 512 U.S. 849 (1994). The question before the Court was whether a motion to appoint counsel under § 848(q)(4)(B) qualified as a "post-conviction proceeding under section 2254 or 2255," invoking the district court's jurisdiction and allowing it to appoint counsel and grant a stay of execution. The language of § 2254 and § 2255 make no reference to motions to appoint counsel, and a simple reading of the habeas statutes would lead one to believe that a motion to appoint counsel would not be a "post-conviction proceeding under section 2254 or 2255." The *McFarland* Court, however, heeded Congress's concern for unrepresented capital prisoners and came to the opposite conclusion, holding that the right to the appointment of counsel adheres *before* the filing of a formal habeas corpus petition.

> This interpretation is the only one that gives meaning to the statute as a practical matter. Congress' provision of a right to counsel under § 848(q)(4)(B) reflects a determination that quality legal representation is necessary in capital habeas corpus proceedings in light of "the seriousness of the possible penalty and . . . the unique and complex nature of the litigation."
> . . .
> [C]riminal defendants are entitled by federal law to challenge their conviction and sentence in habeas corpus proceedings. By providing indigent capital defendants with a mandatory right to qualified legal counsel in these proceedings, Congress has recognized that federal habeas corpus has a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty.

*McFarland*, 512 U.S. at 855, 859 (quoting 21 U.S.C. § 848(q)(7)). The *McFarland* Court's explanation of Congress's intent to provide capital prisoners with habeas counsel, and its illustration

occasions characterized other § 2244 hearings as "post-conviction proceeding[s] under section 2254 or 2255." *See Cantu-Tzin v. Johnson*, 162 F.3d 295, 302 (5th Cir. 1998) (discussing the appointment of § 848(q)(4)(B) counsel for the limited purpose of preparing an equitable tolling claim pursuant to § 2244(d)).

of how far it was willing to go to effectuate that intent, guide our analysis in this case.

The Director asserts that the relief recognized in *McFarland* is limited to those capital prisoners who have not yet filed an initial habeas petition. Such a contention is without merit. While the petitioner in *McFarland* was indeed pursuing his first federal habeas writ, no language in the Supreme Court's opinion limits its holding to *initial petitions*. We note, however, that the Court did place special emphasis on the necessity of counsel during the *initial investigation* of potential habeas claims. *McFarland* explains that Congress, through § 848(q)(4)(B), granted indigent capital prisoners the opportunity to investigate and research the factual bases of possible habeas claims. *Id.* at 855 (discussing the right to "[t]he services of investigators and other experts that may be critical in the pre-application phase of a habeas corpus proceeding, when possible claims and their factual bases are researched and identified"); *id.* at 858 (recognizing the importance of the petitioner's "opportunity" to "meaningfully research and present [his] habeas claims"). The Court found that McFarland—who was without counsel, and was pursuing previously unavailable habeas relief—was denied this opportunity to investigate the factual bases of his potential habeas claims. It seems clear to us that the *McFarland* Court would have been just as concerned with a capital prisoner in need of investigating a successive habeas petition, based on a claim previously unavailable to the prisoner, as it was with the capital prisoner seeking to file an initial petition. Under both scenarios, the prisoner has been denied the *opportunity* to conduct an initial investigation into the factual bases of a potential habeas claim.

One of our cases, however, includes language suggesting that indigent capital prisoners are never entitled to the appointment of counsel to prepare a successive habeas petition. *See Kutzner v. Cockrell*, 303 F.3d 333, 338 (5th Cir. 2002) ("'The *McFarland* Court was concerned only with that

6

period of time between the habeas petitioner's motion for the appointment of counsel and the filing of the initial petition.' Thus, *McFarland* does not justify appointment of counsel or stay of execution for the preparation of a *second* federal habeas petition.") (quoting *Turner v. Johnson*, 106 F.3d 1178, 1182 (5th Cir. 1997)).[4] While such a statement, taken by itself, strongly supports the Director's position, its authoritative value is significantly diminished when read in the proper context.

The issue before the *Kutzner* Court was whether the petitioner was entitled to counsel pursuant to § 848(q)(4)(B) in light of *McFarland*. *Kutzner* begins its analysis by recognizing that the "core concern of *McFarland* [is] that an un-counseled prisoner would be required to 'proceed without counsel in order to obtain counsel and thus would expose himself to the substantial risk that his habeas claim never would be heard on the merits' . . . ." 303 F.3d at 338 (quoting *McFarland*, 512 U.S. at 856). The Court then reviewed the facts of Kutzner's case, and found that he was equipped with competent counsel throughout the entire habeas process. *Id.* ("Kutzner *was* well-represented by qualified counsel . . . [and] current counsel has represented Kutzner for over a year"). The Court also reasoned that his "original § 2254 petition *was* fully litigated on the merits." *Id.* at 338. The opinion takes particular note that Kutzner had been long-aware of the *Brady* material and false testimony alleged in his proposed petition, and that he was not seeking relief pursuant to a new

[4] The petitioner in *Turner* was seeking a stay—rather than the appointment of counsel—pursuant to *McFarland.* Importantly, Turner's habeas petition was pending in federal court at the time of the Court's decision. Seeing that the federal habeas corpus statute grants any federal judge "before whom a habeas corpus proceeding is pending" power to stay an execution, 28 U.S.C. § 2251, the *Turner* Court's observation that the *"McFarland* Court was concerned only with that period of time between the habeas petitioner's motion for the appointment of counsel and the filing of the initial petition" is far from remarkable. *Turner*, 106 F.3d at 1182. It is clear that such language does not concern *McFarland*'s applicability to successive petitions, but instead restates the well-established rule that *McFarland* is the improper channel through which to seek a stay of execution while a habeas petition is before the federal courts.

rule of constitutional law. *Id.* at 336, 337. Based on these findings, the Court ultimately concluded that Kutzner's situation did not implicate the "core concern" of *McFarland*, and that his request for counsel should be denied accordingly.

We read *Kutzner* as holding that the relief enunciated in *McFarland* does not apply to successive habeas petitioners who *had been* afforded sufficient opportunities to investigate the factual bases of their proposed claim. The statement of law cited by the Director, limiting *McFarland* to initial petitions, is not an alternative rationale supporting this narrow fact-based holding.[5] It would be illogical to find otherwise, as this statement of law would wholly subsume, rather than facilitate, the Court's analysis of whether Kutzner enjoyed an opportunity to raise his habeas claim in an earlier petition. Moreover, the contested statement of law does not stand by itself as an alternative holding. The statement is found in the final sentence of a paragraph that addresses the wholly distinct subject of Kutzner's foregone opportunities to raise habeas claims. Further, the Court does not expressly apply the contested statement of law to the facts of Kutzner's case. This absence of analysis is particularly striking in light of the Court's detailed discussion, in the preceding sentences, whether *McFarland*'s "core concern" is implicated by the petitioner's situation.

We find, after reading *Kutzner* in its proper context, that its limitation on *McFarland* does not

---

[5] It is well-established that alternative holdings of this Court are binding on future panels. *See*, *e.g.*, *McClendon v. City of Columbia*, 305 F.3d 314, 327 n.9 (5th Cir. 2002) (en banc); *McLellan v. Mississippi Power & Light Co.,* 545 F.2d 919, 925 n.20 (5th Cir. 1977) (en banc) (stating that all alternative rationales for a given result have precedential value). Our en banc Court in *McClendon* noted, however, that an "alternative analysis should be rare in qualified immunity cases and should not be undertaken routinely by the panels of this court." *McClendon*, 305 F.3d at 327 n.9. While we are mindful that this case does not involve a claim of qualified immunity, *McClendon* clearly supports the proposition that alternative analyses should not be common practice in this Circuit. In light of this principle, we find it improper for this Court to infer alternative rationales or holdings where ones are not clearly expressed.

constitute an alternative rationale or an alternative holding, but rather a mere "judicial comment made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential." *Black's Law Dictionary* 1100 (7th ed. 1999) (defining "obiter dictum"); *see also Centennial Ins. Co. v. Ryder Truck Rental, Inc.*, 149 F.3d 378, 385-86 (5th Cir. 1998) ("That which is 'obiter dictum' is stated only 'by the way' to the holding of a case and does not constitute an essential or integral part of the legal reasoning behind a decision.") (internal quotations omitted). Further, we do not find such dictum persuasive because it contravenes *McFarland*'s intent to provide indigent capital prisoners with the *opportunity* to conduct—at the very least—a single, cursory investigation into the factual bases of each potential habeas claim.

Upon review of the statutory language, *McFarland*, and the prior decisions of this Circuit, we hold that courts are not barred from appointing § 848(q)(B)(4) counsel to prepare an application for authority to file a successive habeas petition. We now proceed to a discussion of whether the petitioner in the case *sub judice* is entitled to such relief.

(2)    Hearn's opportunity to investigate the factual bases of his *Atkins* claim

The Director asserts that Hearn's motion for § 848(q)(4)(B) counsel should be denied on the ground that Hearn, like the prisoner in *Kutzner*, had a sufficient opportunity to investigate the factual bases of his proposed habeas claim. We disagree. Hearn's proposed successive petition will seek habeas relief pursuant to the new constitutional rule created in *Atkins v. Virginia*, 536 U.S. 304 (2002). *Atkins*, however, had not yet been decided when Hearn filed his initial habeas petition. Although *Atkins* was issued while Hearn's first petition was pending in federal court, Texas's habeas-abstention procedure—which barred the filing of a state petition while a habeas writ was pending in

9

federal court—effectively precluded him from seeking *Atkins* relief until his initial habeas petition was disposed of by the federal courts. *See* discussion *infra* Part II.A(4).

Upon the denial of his initial federal habeas petition, Jan Hemphill withdrew from her representation of Hearn. Put plainly, Hearn lost his court-appointed habeas counsel on the very day he became eligible to raise his *Atkins* claim. Hearn made various efforts to persuade Hemphill to file a successive writ petition, and even dispatched family members to the federal district court and Texas Attorney General's Office in an effort to compel her to investigate a successive claim. When all else failed, Hearn promptly contacted his current *pro bono* counsel, who conducted an expedited investigation into Hearn's records and brought such evidence before this Court. We find that Hearn has made a sufficient showing that Texas's habeas-abstention procedure, and the unavailability of qualified habeas counsel after the disposition of his initial petition, denied him the opportunity to sufficiently investigate the factual bases underlying his *Atkins* claim.

(3)     Hearn's showing of mental retardation

The Director maintains that, even if Hearn were, in fact, denied an opportunity to investigate the factual bases of his *Atkins* claim, we should withhold § 848(q)(4)(B) counsel on the ground that Hearn has failed to make the requisite *prima facie* showing of mental retardation.[6] Such an assertion is without merit. Because § 848(q)(4)(B)—read in conjunction with *McFarland*—affords counsel

---

[6] The American Association on Mental Retardation defines mental retardation as: (1) subaverage general intellectual functioning (*i.e.*, an IQ of approximately 70 to 75 or below) existing concurrently with (2) related limitations in adaptive functioning; and (3) onset before the age of eighteen. AM. ASS'N ON MENTAL RETARDATION, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 1 (9th ed. 1992). "Psychologists and other mental health professionals are flexible in their assessment of mental retardation; thus, sometimes a person whose IQ has tested above 70 may be diagnosed as mentally retarded." *Ex parte Briseno*, No. 29,819-03, WL 244826, at *7 n.24 (Tex. Crim. App. Feb. 11, 2004).

to prisoners *to prepare* federal habeas petitions, "a substantive, merits assessment of the petition is irrelevant to the appointment of counsel." *Weeks v. Jones*, 100 F.3d 124, 127 (11th Cir. 1996); *see Barnard v. Collins*, 13 F.3d 871, 879 (5th Cir. 1994) ("On its face, § 848(q)(4)(B) does not condition the appointment of counsel on the substantiality or non-frivolousness of petitioner's habeas claim."). As a result, a prisoner's motion for counsel to investigate and prepare a successive *Atkins* claim need only be supported by a colorable showing of mental retardation.[7]

We hold that Hearn has met this modest evidentiary threshold. For instance, Hearn has presented school records showing that he failed first grade, and that his marks often hovered in the 50s (or below) despite his regular attendance. He further proffered evidence that his score on the state-administered Weschler Adult Intelligence Scale-Revised ("WAIS-R") Short-form test—taking into account its inherent band of error—falls within the upper range of scores indicating mild mental retardation.[8] Hearn also presents a note from Hemphill stating her belief that he was "not very

---

[7] Congress enacted the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") with the intent to curb the vast number of habeas filings in the federal courts. In furtherance of this objective, AEDPA requires that potential successive petitioners present the merits of their habeas writ to the courts of appeals before such claim is filed in district court. 28 U.S.C. § 2244(c). We think it concomitant with this Congressional intent to withhold § 848(q)(4)(B) counsel for certification proceedings absent some colorable showing by the prisoner that he is, in fact, entitled to habeas relief.

[8] Hearn scored an 82 on the WAIS-R Short-form test. "The basic requirement for any short-form is a minimum correlation of .90 with the full administration. . . . [W]ith a .90 correlation, two-thirds of the IQs will fall within 9 points of a person's actual IQ and a full one-third will be 10 or more points away from the actual IQ." GARY GROTH-MARNAT, HANDBOOK OF PSYCHOLOGICAL ASSESSMENT 200 (3d ed. 1999). Due to the Short-form's substantial margin of error, we find that Hearn may have an IQ "between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Atkins,* 536 U.S. at 309 n.5.

11

intelligent—maybe below normal."[9]  He further cites the trial testimony of a family member to demonstrate his compromised social skills.[10]  We find that this evidence, while certainly insufficient to establish a *prima facie* case of mental retardation, nonetheless presents a colorable claim of mental retardation sufficient to justify the appointment of counsel to investigate and prepare a § 2244(b)(3)(A) application.

(4)     Hearn's showing of rare and equitable circumstances

The Director lastly contends that Hearn's motion for counsel should be denied because his eventual *Atkins* claim will be time-barred.  It is true that potential procedural bars may be so conclusive that the right to counsel under § 848(q)(4)(B) becomes unavailable.  *See Cantu-Tzin v. Johnson*, 162 F.3d 295, 298-99 (5th Cir. 1998); *Barnard*, 13 F.3d at 879.  This Court in *Cantu-Tzin* explained that the "[a]ppointment of counsel for a capital-convicted defendant would be a futile gesture if the petitioner is time-barred from seeking federal habeas relief."  162 F.3d at 299.  Hearn cannot bring his *Atkins* claim within the one-year statute of limitations dictated by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").[11]  The AEDPA limitations period, however,

---

[9] To show that Hearn has not established a colorable claim of mental retardation, the dissent points to Hearn's "long, personalized request for a pen pal via a web site."  The dissent quite ably finds that the request "used complete sentences."  If this request were in fact transcribed by Hearn, it may well be relevant to the ultimate issue of whether Hearn is in fact mentally retarded.  Unlike the dissenting judge, however, we refuse to accord such weight to mere hearsay evidence.

[10] Hearn's aunt testified that he was a "follower" who tended to be "influenced by the wrong type of people," and that when he left home at age 18, she was still "concerned [*sic*] about if he was being taken care of."

[11] AEDPA tolls the limitations period for one-year after a new retroactive constitutional rule is enunciated.  28 U.S.C. § 2244(d)(1)(C).  The retroactive rule in *Atkins* was issued on June 20, 2002; the AEDPA one-year limitations period for filing an *Atkins* claim therefore expired on

is subject to equitable tolling in "rare and exceptional circumstances." *Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998). Hearn contends that Texas's habeas-abstention procedure, known as the "two-forum rule," presented a rare and exceptional circumstance that precluded him from raising an *Atkins* claim.

Texas state law has traditionally barred prisoners from having pending habeas litigation in both state and federal courts. Through its judicially-created two-forum rule, Texas prevented petitioners from lodging a mixed petition in federal court and simultaneously returning to state court, or having a federal court hold a petition in abeyance while further state court remedies were sought. *See generally Ex parte Green*, 548 S.W.2d 914, 916 (Tex. Crim. App. 1977) ("A petitioner must decide which forum he will proceed in, because [the Texas Court of Criminal Appeals] will not, and a trial court in this State should not, consider a petitioner's application so long as the federal courts retain jurisdiction over the same matter.").[12]

On February 11, 2004, the Texas Court of Criminal Appeals expressly modified the two-forum rule, enabling Texas courts to consider the merits of a subsequent writ application once a federal court stays the federal habeas proceedings. *Ex parte Soffar*, No. 29,890, 2004 WL 245190 (Tex. Crim. App. Feb. 11, 2004). The court in *Soffar* reasoned:

---

June 20, 2003. Hearn has not yet raised his *Atkins* claim in federal court.

[12] Other states have traditionally permitted petitioners to file a mixed petition in federal court, and subsequently litigate the unexhausted claims in state court while the federal petition was held in abeyance. *See, e.g., Zarvela v. Artuz*, 254 F.3d 374, 381 (2d Cir. 2001) (holding that a federal court, presented with a mixed petition, should dismiss the unexhausted claims and stay the exhausted claims to avoid the AEDPA time bar); *Freeman v. Page*, 208 F.3d 572, 577 (7th Cir. 2000) (noting that the proper action for petitioner was "filing in both courts" and requesting that the district judge stay the federal proceedings).

> Because of the strict one-year statute of limitations in the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the application of [the two-forum rule], combined with the federal exhaustion requirement, may lead to unintended and unfortunate consequences. The problematic situation is when the Supreme Court announces a "watershed" procedural or substantive change in the law which applies retroactively to all cases, even those on collateral review. *Atkins v. Virginia* seems to be one such case.

*Id.* at *3.

By June 20, 2003, the date the AEDPA limitations period for *Atkins* claims expired, Hearn had already filed his initial federal habeas petition, and he was awaiting this Court's ruling on his application for a COA. If Hearn had petitioned for *Atkins* relief in Texas court, he would have been compelled to move the federal court to dismiss without prejudice his then-pending federal petition. Such a dismissal likely would have time-barred Hearn from later asserting the claims in his pending federal petition. *See Duncan v. Walker*, 533 U.S. 167, 172 (2001) (stating that the AEDPA limitations period is not tolled during the pendency of a federal habeas petition). On the other hand, because Hearn waited to file his *Atkins* claim until the disposition of his then-pending federal habeas proceeding, he faced Texas's assertion of a time bar on his *Atkins* claim. The two-forum rule appears to have effectively forced Hearn to choose between federal review of his pending writ petition and his right to pursue successive habeas relief under *Atkins*.

The Director contends that equitable tolling is improper because—four months prior to *Soffar*—the Texas Court of Criminal Appeals implicitly negated the two-forum rule when it remanded a petitioner's *Atkins* claim for review on the merits even though that petitioner had a writ pending in federal court. *Ex parte Smith*, No. 40,874-02 (Tex. Crim. App. Oct. 8, 2003). This argument is without merit. One petitioner's willingness to jeopardize review of his pending federal habeas petition

in order to file an *Atkins* claim does not mean that all others must. For instance, it is plausible that the petitioner in *Smith* was prepared to sacrifice review of his federal writ petition because it was comprised of frivolous claims. Moreover, the Texas Court of Criminal Appeals's decision to remand one case for review on the merits, absent any express criticism of the governing two-forum rule, does not undermine decades of Texas precedent reinforcing the preclusive effect of that rule. Although it is not apparent that the AEDPA limitations period *must* be equitably tolled on Hearn's behalf, we find that the facts relevant to this analysis are in dispute such that Hearn is entitled to counsel to investigate and prepare a tolling claim.

As discussed above, Hearn has made sufficient showings that he was not afforded an opportunity to investigate his *Atkins* claim, that he is in fact mentally retarded, and that his potential *Atkins* claim is not time-barred. This case therefore implicates the "core concern of *McFarland* . . . 'that an un-counseled prisoner would be required to proceed without counsel in order to obtain counsel and thus would expose himself to the substantial risk that his claim would never be heard on the merits' . . . ." *Kutzner*, 303 F.3d at 338 (quoting *McFarland*, 512 U.S. at 856). As a result, we hold that Hearn is entitled to the appointment of counsel and reasonably necessary services under § 848(q)(4)(B) to investigate and prepare his application for authority to file an *Atkins* claim.

B.    Stay of Execution

Hearn also moves this Court for a stay of execution to provide his appointed counsel with sufficient time to prepare an application for authority to file his *Atkins* claim. The Director contends that this Court is not authorized to grant a stay of execution because a writ of habeas corpus is currently not pending before this Court as required by 28 U.S.C. § 2251. The Director's claim is

15

meritless. The Supreme Court in *McFarland* held that a habeas proceeding is pending before a court, for the purposes of staying an execution, once a capital prisoner moves for the appointment of habeas counsel pursuant to § 848(q)(4)(B). 512 U.S. at 856. The *McFarland* Court explained that the pre-application appointment of counsel alone, without the time to adequately develop the facts and brief the claims, renders the statutory guarantee of counsel an empty promise. *Id.*

In accordance with the reasoning of *McFarland*, we find that a stay of execution is imperative to ensure the effective presentation of Hearn's application for authority to file his *Atkins* claim. Because Hearn was not dilatory in his search for counsel, and the stay of execution will not substantially harm the State of Texas, the preliminary stay ordered March 4, 2004, is hereby extended to provide Hearn's counsel with sufficient time to prepare an application for § 2244(b)(3)(A) authority.

## III.

For the reasons stated above, Hearn's motions for the appointment of counsel and for stay of execution are GRANTED. Accordingly, we REMAND to the district court to appoint counsel and furnish reasonably necessary services to help Hearn present his application for authority, and—should such authority be granted—his formal *Atkins* petition. Hearn shall file his completed application for § 2244(b)(3)(A) authority no later than six months from today. Accordingly, Hearn's execution is STAYED pending the resolution of proceedings consistent with this order.

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring.


I concur fully in Judge Clement's opinion. Hearn is on death row in Texas. He does not have counsel. The Texas Defender Service, lacking the resources to undertake the representation of Hearn and aware that Hearn's date of execution was looming, asked the federal district court to stay the execution and appoint counsel to develop his claim that he is mentally retarded and ineligible for execution. This case reached the panel only hours before the execution. We granted a stay to allow sufficient time to properly decide the request. We found the case sufficiently complex and uncertain that additional briefs and oral argument were requested. The dissent now "regrets" not dissenting from that stay.

I remain convinced that the stay was proper and that this prisoner is entitled to a lawyer and an opportunity to investigate and present any claim of retardation that he may have. I am not prepared to hold that he must first make a prima facie case that he is retarded to be entitled to a lawyer to make that case. The dissent argues just that and is prepared to disregard a filed affidavit as incompetent evidence. This approach has it backwards. We don't have enough evidence to peg Hearn's ability. What little "evidence" that has been presented is equivocal and needs explanation. If the record before us is

17

all that Hearn can produce before the district court with the assistance of a lawyer, I would quickly agree that it falls far short of a prima facie showing. There is enough, however, to warrant development as Judge Clement explains. As best I sift from its rhetoric, the dissent would hold that a prisoner on death row with no lawyer must make a prima facie case that he is so retarded that he cannot be executed in order to have the benefit of counsel.

We are instructed that we must take this approach or face the fact that every person on death row with no lawyer but with colorable claims of retardation would be entitled to a lawyer. I do not see that as a frightening possibility. Rather, that it is being urged by the dissent as such is a chilling comment on the confused state of the law of capital punishment in this circuit.

The dissent would run the one year clock on Hearn during the time he had no lawyer. If there is a doctrine of equitable tolling, it must not tolerate a limitations bar to a retarded prisoner awaiting execution and without counsel. It is no answer to assert that Hearn is not retarded unless we are prepared to dispense with lawyers and hearings.

But, it is argued, Hearn did have counsel for part of the time. The dissent has no answer for the fact that during that period of representation a claim of retardation could not have been filed, given the two-forum rule Texas then adhered to. The

18

dissent in a footnote asserts, with no authority, that Texas was never serious about that rule, passing over the fact that much later, Texas, recognizing the plight it created for petitioners such as Hearn, abandoned it.  The dissent says the two-forum rule was  never real.

The dissent accuses the majority of ignoring circuit precedent, Judge Davis's opinion in *Kutzner* and Judge Politz's opinion in *Turner*.  It bears mention that neither petitioner in these cases had an available writ path.  The panel in *Kutzner* pointedly observed that the petitioner had no right to pursue a successive writ with a claim that did not rely upon a new rule of constitutional law.  Petitioners had counsel in both cases at all relevant times and neither petitioner presented *Akins* claims.

This is not an easy case.  The state has been represented at all times by counsel and has full access to prisoner records and other resources to reply to this claim.  I cannot be so dismissive of Hearn's statutory right as to refuse him a lawyer when at the least there is enough to warrant examination.  If there is nothing there, as the dissent seems to know, the district court will so conclude.  In the end I have more confidence in facts decided by an Article III trial judge with competent counsel before him than those determined on appeal by appellate judges.

JERRY E. SMITH, Circuit Judge, dissenting:

Even by his own lawyer's estimation, petitioner Hearn is not retarded. He has made good grades off and on throughout his academic career. He helped orchestrate a multi-stage crime ending in murder. He has scored well above the retardation threshold on standardized tests. Yet, on the thin assertion that he "may be retarded," the majority has allowed him to succeed in a last-minute petition for stay, filed two days before his scheduled execution, and has done so in blatant violation of governing Fifth Circuit law.[13]

The majority has seriously undermined this court's capital habeas jurisprudence. In much the same way as a good advocate would do, the majority has painted a roadmap for virtually any capital habeas petitioner to obtain an indefinite delay in his execution by raising a frivolous, eleventh-hour claim of *possible* retardation.[14] In the process, the majority has clouded the claims of those inmates who may be truly retarded and are properly entitled to benefit from the Supreme Court's recent attention to their plight.

The majority certainly reaches a happy result for petitioner

---

[13] I regret not having dissented from the initial order granting a stay of execution.

[14] The majority opinion might thus be aptly described as "a triumph of lawyering from the bench." *Kennedy v. Lockyer*, No. 01-55246, 2004 U.S. App. LEXIS 11585, at *47, *70-*71 (9th Cir. June 14, 2004) (O'Scannlain, J., dissenting).

Hearn: He receives an attorney and the resources to investigate a last-minute and totally meritless claim of mental retardation. Courts, however, typically encounter and analyze such things as precedents and statutory language. They do not merely plow precipitously through binding caselaw, sidestep a Congressionally-enacted habeas regime, and declare that the equities mandate a different result. Unfortunately, the majority here, acting with the best of intentions, has engaged in just such an enterprise. Accordingly, I respectfully dissent.

## I.

The majority ignores precedential language from a binding opinion of this circuit. In *McFarland v. Scott*, 512 U.S. 849 (1994), the Court offered a broad interpretation of the attorney appointment provision of 21 U.S.C. § 848(q)(4)(B)[15] and granted the petitioner an attorney to investigate grounds for an *initial* petition. Hearn, by contrast, requests an attorney to investigate and develop a record for a *successive* petition. Congress, through the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), has created a plain distinction between those two types of

---

[15] "On its face, [§ 848(q)(4)(B)] grants indigent capital defendants a mandatory right to qualified legal counsel and related services 'in any [federal] post conviction proceeding.'" *McFarland*, 512 U.S. at 854 (footnote omitted) (brackets in original).

investigations.[16]

Although *McFarland*'s use of broad language arguably could, on its own, prompt one to apply its "core concerns" to a successive setting, two binding Fifth Circuit opinions bar the majority's application of § 848(q)(4)(B). One discusses the context in which *McFarland* operated: "The *McFarland* Court was concerned only with that period of time between the habeas petitioner's motion for the appointment of counsel and the filing of the initial petition." *Turner v. Johnson*, 106 F.3d 1178, 1182 (5th Cir. 1997). The other flatly forecloses the appointment of habeas counsel to prepare a successive petition: "*McFarland* does not justify appointment of counsel or stay of execution for the preparation of a second federal habeas petition." *Kutzner v. Cockrell*, 303 F.3d 333, 338 (5th Cir. 2002) (citing *Turner*, 106 F.3d at 1182).

A.

The majority skips past *Kutzner* by making two flawed argu-ments. First, it attempts to limit *Kutzner* largely to its facts.[17]

---

[16] *Compare* 28 U.S.C. § 2254 (describing the procedures for filing a habeas petition on behalf of a "person in custody pursuant to the judgment of a State court") *with* 28 U.S.C. § 2244(b) (describing additional hurdles a party must satisfy if it presents a claim in a second or suc-cessive habeas petition).

[17] "We read *Kutzner* as holding that the relief enunciated in *McFarland* does not apply to successive habeas petitioners who *had been* afforded sufficient opportunities to investigate the factual bases of their proposed claim."

The majority also refers to the quoted language from *Kutzner* as a "narrow fact-based holding."[18]  The majority's stated factual differences do not distinguish *Kutzner* from the instant case.

One factual difference apparently involves the presence and competence of counsel.[19]  As discussed *infra*, Hearn cannot challenge the quality of his habeas counsel.  *See* 28 U.S.C. § 2254(i).  His counsel never abandoned him but merely determined that she could not help him because he had no further claims.  Moreover, any alleged abandonment or withdrawal occurred well *after* the time during which Hearn could have filed his petition.

A second factual difference centers on the probability that the *Kutzner* petitioner could have known of the claim contained in the successive petition.[20]  Although Hearn could not have known of

---

[18] The majority also makes the surprising assertion that *Kutzner* contains language only "*suggesting*" that indigent capital prisoners are never entitled to the appointment of counsel to prepare a successive habeas petition" (emphasis added).  There is nothing merely "suggestive" about *Kutzner*'s explicit holding that "*McFarland* does not justify appointment of counsel or stay of execution for the preparation of a second federal habeas petition."  *Kutzner*, 303 F.3d at 338.  Thus, *Kutzner* makes an emphatic statement, not just a hint, about the law, and the majority's desperate description of it as a "suggestion" is transparent.

[19] "The [*Kutzner*] Court then reviewed the facts of Kutzner's case, and found that he was equipped with competent counsel throughout the entire habeas process."

[20] *Kutzner*, 303 F.3d at 336 (stating that Kutzner, who claimed that the government withheld forensics evidence, "knew of the [skin] scrapings, blot, and first hair at trial, on appeal, during his state habeas petition and during the federal habeas petition.  He never requested its testing.").

23

an *Atkins*[21] claim during his trial or through portions of his direct appeal,[22] he certainly knew of it when the Supreme Court decided *Atkins*. Hearn could have acted on it within the one-year window that AEDPA grants to petitioners who pursue some newly-announced Constitutional claims that the Supreme Court applies retroactively.[23]

*Even if* the specific circumstances of *Kutzner* have some differences with the facts of this case, the larger circumstances to which the quoted language refers are identical: "*McFarland* does not justify appointment of counsel or stay of execution for the preparation of a second federal habeas petition." In both cases, party has requested an attorney to help prepare and file a successive habeas petition; in both, procedural default bars their consideration.

B.

The majority, however, parries the *Kutzner* language by invoking the mantra of "*dictum*" and concluding that *Kutzner* has no ef-

---

[21] *Atkins v. Virginia*, 536 U.S. 304 (2002).

[22] The *Atkins* claim, of course, did not exist at that time.

[23] 28 U.S.C. § 2244(d)(1)(C). Additionally, as discussed *infra*, Hearn has offered insufficient evidence to suggest either the presence of mental retardation or the effect of the alleged retardation on his ability to press an *Atkins* claim during the one-year period.

fect on future panels facing the same situation.[24]  The majority incorrectly characterizes the *Kutzner* statement and its relationship to *Kutzner*'s holding.

As part of its discussion of *McFarland*, this court in *Kutzner* provided alternative rationales for denying the petitioner's request for an attorney and a stay.  Both justifications independently blocked the petitioner in *Kutzner*, and one has direct application in the instant case.  Neither reason, therefore, functions only as *dictum*.[25]

The first justification looked to "[t]he core concern of *McFarland*SSthat an un-counseled prisoner would be required to 'proceed without counsel in order to obtain counsel and thus would expose him to the substantial risk that his habeas claims never would be heard on the merits.'"  *Kutzner*, 303 F.3d at 338 (quoting *McFarland*, 512 U.S. at 856).  The opinion noted that Kutzner's attorney served adequately and helped prepare a petition pursuant to § 2254. *Id*.

After stating that Kutzner's "current" counsel had "represent-

---

[24] "We find, after reading *Kutzner* in its proper context, that its limitation on *McFarland* . . . constitute[s] a mere 'judicial comment made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential.'" (quoting the definition of "obiter dictum" from BLACK'S LAW DICTIONARY 1100 (7th ed. 1999)).

[25] By way of contrast, a rationale explained by way of analogy to a situation different from that presented in the case at issue is *dictum* and not an alternative holding.  E.g., *Shepherd v. Int'l Paper Co.*, No. 03-20721, 2004 U.S. App. LEXIS 10592, at *11-*12 (5th Cir. May 28, 2004).

ed Kutzner for more than one year," the opinion took a dramatic two-sentence turn. Specifically, it moved from a fact-specific analysis of Kutzner's claim to a more general analysis of *McFarland* and its impact on successive petitions in this circuit. The opinion quoted the aforementioned language from *Turner*, 106 F.3d at 1178, and quickly applied it to all successive petitions: "Thus, *McFarland* does not justify appointment of counsel or stay of execution for the preparation of a *second* federal habeas petition." *Kutzner*, 303 F.3d at 338.

Either justification articulated in *Kutzner* would block that petitioner's request for an attorney. "When confronting decisions of prior panels[,] we are bound by 'not only the result but also those portions of the opinion necessary to that result.'" *Gochicoa v. Johnson*, 238 F.3d 278, 286 n.11 (5th Cir. 2000) (quoting *Seminole Tribe v. Florida*, 517 U.S. 44, 67 (1996)). Furthermore, "'the principle of *stare decisis* directs us to adhere not only to the holdings of our prior cases, but *also to their explications of the governing rules of law*.'" *Id.* (quoting *County of Allegheny v. Am. Civil Liberties Union*, 492 U.S. 573, 668 (1989) (Kennedy, J., concurring in part and dissenting in part)).[26]

---

[26] Chief Justice Rehnquist has defined "*dicta*" as a court's consideration of "abstract and hypothetical situations not before it." *Connecticut v. Doehr*, 501 U.S. 1, 30 (1991) (Rehnquist, C.J., concurring). *See also* BLACK'S LAW DICTIONARY 1100 (7th ed. 1999) (defining "obiter dictum" as "A judicial comment . . . that is unnecessary to the decision in the case and therefore not precedential").

(continued...)

Either rationale advanced in *Kutzner* would control the outcome of that case. Neither rationale considers "unnecessary" matters, because each addresses an element of the petitioner's situation. The *Kutnzer* petitioner both (1) had adequate counsel for an extended period of time *and* (2) wished to file a successive petition. The petitioner filed a request for an attorney as part of preparation of a successive federal habeas petition.

Thus, although the second reason for denying the petitioner's request addresses a broader issue than does the fact-intensive reason, it produces the identical resolution.[27] Because "alternative holdings are binding precedent," *Kutzner* has bound subsequent panels with respect both to the "core concern" fact-intensive inquiry and to the broader successive petition analysis. *Williams v. Cain*, 229 F.3d 468, 474 n.5 (5th Cir. 2000) (internal citations and quotations omitted).[28]

_____

[26](...continued)


[27] In essence, the *Kutzner* panel told the petitioner that (1) the facts do not line up with the core concerns of *McFarland*; and (2) even if your facts *did* align with *McFarland*, your general situationSSfiling a successive petitionSSlies outside of *McFarland*.

[28] *See also Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 574 (5th Cir. 2004):

    . . ."[I]t is the firm rule of this circuit that one panel may not overrule the decisions of another." *United States v. Taylor*, 933 F.2d 307, 313 (5th Cir. 1991) . . . . *See, e.g.*, *United States v. Adamson*, 665 F.2d 649, 656 n.19 (5th Cir. 1982) (holding that decisions on issues that were fully presented and litigated, and likely to arise on retrial, are not dictum and are still binding precedent even if the decision was not necessary to support the ultimate ruling, such as an alternative

(continued...)

C.

The panel provides a third spurious reason to ignore *Kutzner*: "Further, we do not find such dictum persuasive because it contravenes *McFarland*'s holding." A subsequent panel cannot determine that a prior panel's binding decision undermines or conflicts with a Supreme Court decision issued before that of the prior panel. Instead, we assume the prior panel took all pre-existing Supreme Court precedent into account.

"Our rule of orderliness prevents one panel from overruling the decision of a prior panel." *Teague v. City of Flower Mound*, 173 F.3d 377, 383 (5th Cir. 1999). Rather, if a panel identifies

---

[28](...continued)
holding).

In its frantic attempt to escape the bounds of *Kutzner*, the majority, while acknowledging that alternative holdings are both binding on future panels, observes that in *McClendon v. City of Columbia*, 305 F.3d 314, 327 n.9 (5th Cir. 2002) (en banc), *cert. denied*, 537 U.S. 1232 (2003), the court warned that in *qualified immunity cases*, panels should not routinely announce alternative holdings. From that, the majority concludes that we should not infer that the two rationales in *Kutzner* are both holdings. The obvious flaw in that theory is that *Kutzner* was decided *before McClendon*, so the *Kutzner* panel could not possibly have known about the warning in *McClendon* when it issued its alternative holdings.

The majority also announces, out of whole cloth, that under *McClendon* it is "improper for this Court to infer alternative rationales or holdings where ones are not clearly expressed." As the majority admits, however, *McClendon* was addressing only the peculiar methodology used in qualified immunity cases, *see Siegert v. Gilley*, 500 U.S. 226, 232-34 (1991), so footnote 9 of *McClendon* does not apply here. Outside the context of qualified immunity, no opinion of this court has ever suggested that alternative holdings are improper. The majority's bold assertion to the contrary is handy for it to use in its attack on *Kutzner* but finds no support in our jurisprudence.

28

a purported conflict, it must acknowledge the binding circuit opinion and recommend taking the matter to the en banc court.  Because the *Kutzner* language is a binding holding, not *dictum*, the majority, remarkably, has attempted to hurdle our regular procedures for reconciling allegedly conflicting or important caselaw.  FED. R. APP. P. 35(a).[29]  Such nimble methodology is easy and convenient, and it may turn out to be effective advocacy, but it is not right.

## D.

Curiously, despite the majority's desire to distinguish the facts and to dismiss the language of *Kutzner*, it cites that very opinion in support of a broader point regarding the "core concern of *McFarland*" (quoting *Kutzner*, 303 F.3d at 338).  The quotation serves little purpose but to parrot language from *McFarland*.  The citation of an opinion that the majority has otherwise disregarded factually and doctrinally suggests that the majority cares what the prior panel stated only when it suits the majority's general outlook.  Apparently, the line between precedential authority and *dictum* lies in the eye of the majority.

Consequently, *McFarland* does not stretch as far as the majority would like.  *Kutzner* cabins *McFarland* in this circuit and  di-

---

[29] "An en banc hearing or rehearing is not favored and ordinarily will not be ordered unless: (1) en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or (2) the proceeding involves a question of exceptional importance."

rectly forecloses the application of § 848(q)(4)(B) to a successive petition.  Hearn is not entitled to  the appointment of an attorney to investigate and prepare a successive petition.

## II.

Even if *Kutzner* did not apply, and even if § 848(q)(4)(B) allowed Hearn to request an attorney to prepare a successive habeas petition, Hearn faces another problem: on-point statutory language that blocks any habeas relief.

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of . . . the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review[.]

28 U.S.C. § 2244(d)(1)(C).  Both Hearn and his purported *Atkins* claim fit the statute's requirements.

Although the majority makes the broad statement that § 848(q)(4)(B) and (8) "grant indigent capital prisoners a mandatory right to qualified legal counsel . . . in all federal post-conviction proceedings," § 848(q)(8) limits that right to "*available* judicial proceedings" (emphasis added).  Section 848(q)(8) states only that an attorney will represent the defendant through "every subsequent stage of *available* judicial proceedings" (emphasis added).  Though a petitioner theoretically has any motion

30

*available* to him, some motions do not articulate cognizable claims and have no chance of success.[30]  For example, "neither *McFarland* nor § 848(q)(4)(B) requires appointment of counsel for the wholly futile enterprise of addressing the merits of a time-barred habeas petition."  *Cantu-Tzin v. Johnson*, 162 F.3d 295, 296 (5th Cir. 1998).

The majority concedes that the one-year period has passed and that Hearn cannot file a successive writ based on *Atkins*.[31]  The majority, however, applies the unusual device of equitable tolling to allow Hearn "sufficient time to prepare an application for § 2244(b)(3)(A) authority."  Although courts may equitably toll a statute of limitations under AEDPA, a court cannot take such action lightly.  Rather, as the majority admits, "[e]quitable tolling [is permitted[ 'in rare and exceptional circumstances.'"[32]

The majority cites a number of inadequate reasons to toll limitations.  Two of those reasonsSSHearn's alleged abandonment at the hands of his counsel and his showing of a "colorable" claim of men-

---

[30] *See, e.g.*, *Washington v. Alaimo*, 934 F. Supp. 1395 (S.D. Ga. 1996) (discussing whether to impose rule 11 sanctions in response to an inmate's self-titled "Motion To Kiss My Ass").

[31] Contrary to the claim made in the concurrence, I do not take issue with the notion that "every person on death row with no lawyer but with colorable claims of retardation would be entitled to a lawyer."  Hearn's problem is that he (1) had a capable lawyer for many months and (2) began proceedings for an out of time, successive petition and has presented hardly a shred of evidence to suggest that his claim is anything more than frivolous.

[32] *United States v. Riggs*, 314 F.3d 796, 799 (5th Cir. 1999) (emphasis added) (quoting *Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998)).

tal retardationSSoffer nothing rare or exceptional to warrant the temporary invalidation of a carefully-drafted habeas regime.[33]


A.

Although we have applied equitable tolling on behalf of defendants as a result of attorney misbehavior, we have granted tolling only in very specific situations involving egregious and deceptive behaviorSSfor example, where a petitioner alleged that his attorney actively misled him into believing that the attorney filed a timely § 2255 petition, *United States v. Wynn*, 292 F.3d 226, 230 (5th Cir. 2002).[34]  "Equitable tolling applies principally when the plaintiff is actively misled by the defendant . . . or is prevented in some

---

[33] The majority also discusses the Texas "two forum" rule of comity, under which a "petitioner must decide which forum he will proceed in, because this Court will not, and a trial court in this State should not, consider a petitioner's application so long as the federal courts retain jurisdiction of the same matter."  *Ex parte Green*, 548 S.W.2d 914, 916 (Tex. Crim. App. 1977).  Texas courts have rarely applied the rule, and it was recently amended so that state courts could entertain a petitioner's *Atkins* claim while that same petitioner had a federal habeas writ pending.  *Ex parte Soffar*, No. 29,980-02, 2004 Tex. Crim. App. LEXIS 200, at *9 (Tex. Crim. App. Feb. 11, 2004).

Hearn did not investigate his possible *Atkins* claim while his federal claim worked its way through the Fifth Circuit and the Supreme Court.  He also did not even attempt to file anything in state court to challenge the traditional application of the rule.  Even if the two forum rule prevented Hearn from filing his *Atkins* claim, the factors discussed *infra*SSespecially the absolute lack of any evidence to support Hearn's retardation claimSSrender equitable tolling entirely inappropriate.

[34] "We agree with the district court that Wynn's allegation that he was deceived by his attorney into believing that a timely § 2255 motion had been filed on his behalf presents a 'rare and extraordinary circumstance' beyond petitioner's control that could warrant equitable tolling of the statute of limitations."  *Wynn*, 292 F.3d at 230.

32

extraordinary way from asserting his rights." *Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999)

Hearn has not alleged that Jan Hemphill, his appointed habeas counsel, engaged in any kind of deceit, and the record does not remotely support any such contention. Rather, any conceivable lack of attention by Hemphill did not affect the timeliness or legitimacy of Hearn's possible *Atkins* claim. Hemphill did not "withdr[a]w her representation of Hearn" until well after the one-year statute of limitations had ended. Although Hemphill could have investigated a possible *Atkins* claim while she awaited the decisions of this court and the Supreme Court, she chose not to do so.

Hemphill provides a simple reason for her inaction: "During the time I represented Mr. Hearn I did not believe him to be mentally retarded. This is based on my dealings with him and in representing him."[35] Importantly, Hearn has not alleged, and *cannot* allege, that his counsel offered deficient performance during the time in which he could have raised an *Atkins* claim.[36]

Although the majority flatly states that "Upon the denial of his initial federal habeas petition, Jan Hemphill[, Hearn's court-

---

[35] Hemphill subsequently moderated her statement in a declaration given on March 10, 2004: "At the time, I did not consider mental retardation one way or the other." Both statements show, at the least, that the possibility that Hearn is retarded never entered Hemphill's mind.

[36] 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

appointed habeas counsel,] withdrew from her representation of Hearn[,]" it does not inform the reader of Hemphill's specific conduct in representing Hearn. After sending her certiorari petition to the Supreme Court, Hemphill sent a letter to Hearn informing him that "[f]or all practical purposes, this is the last service I can give you as my client." She also told him to "let [her] know" if she could answer any questions he might have. When Hearn contacted Hemphill to file more appeals, Hemphill "told him [she] was not aware of any claims that he could raise in a successive petitions [sic] and that if he wanted to file other appeals, he should obtain other counsel."

Consequently, Hemphill did not "withdraw from her representation of" Hearn in any meaningful sense. She filed every claim and pursued every ground[37] of appeal that she considered valid. When asked about other claimsSSwhich may or may not have included an *Atkins* claimSSshe did not walk away and refuse to talk to Hearn, but instead told him merely that she did not see any other valid grounds of habeas relief. The majority's allegations and claims of attorney failure function as another means of considering the "ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings." 28 U.S.C. § 2254(i). AEDPA, however, proscribes such a consideration.

Moreover, assuming *arguendo* that Hemphill's behavior is ques-

---

[37] Hemphill's initial habeas petition listed nineteen grounds for relief.

tionable, any inadequate service on her part occurred *after* the time in which Hearn could have pursued his *Atkins* claim. The Supreme Court decided *Atkins* in June 2002. Hemphill sent her final letter to Hearn fifteen months later§§in September 2003. Had Hemphill not "withdrawn" her representation of Hearn, his alleged evidence of retardation would not have given him the chance to file an *Atkins* claim beyond the one-year statute of limitations.[38] Thus, the majority has taken Hemphill's judgment that Hearn had no other valid claims§§something a petitioner may not challenge under AEDPA§§and used it to provide Hearn with an opportunity he would not otherwise have had to pursue an out-of-time, and totally frivolous, claim of mental retardation.[39]

---

[38] I should also note that in its apparent rush to grant Harris relief, the majority has unfairly besmirched Ms. Hemphill's reputation as a competent attorney. Hemphill filed a thorough and reasonable initial habeas petition that contained nineteen separate grounds for relief. Contrary to the majority's cheap implication, Hemphill did not pass her time by eating crayons and blowing bubbles at the ceiling. The majority should not allow its zeal in trying to establish a point to be expressed at the unfair expense of a diligent attorney.

[39] As part of equitable tolling, we have looked to the incentives such a grant may create. *Larry v. Dretke*, 361 F.3d 890, 898 (5th Cir. 2004) ("Finally, to grant equitable tolling in these kinds of situations would invite the premature filing of state habeas petitions[.] This would allow applicants to circumvent the exhaustion requirement and would undermine the system of comity established by federal law."). Under the majority's rule, an attorney's purported "withdrawal" gives life to claims otherwise procedurally barred. Such a rule certainly could invite some less-than-scrupulous parties to manipulate the majority's good intentions and to withdraw so as to resurrect defaulted claims.

B.

As part of its weighing of the equities, the majority finds that Hearn has offered sufficient evidence to present "a colorable claim of mental retardation sufficient to justify the appointment of counsel[.]"  Hearn's proffered evidence does not remotely support such a conclusion.

In reaching its result, the majority makes two contradictory statements.  First, it quotes *Weeks v. Jones*, 100 F.3d 124, 127 (11th Cir. 1996), to assert that "a substantive, merits assessment of the petition is irrelevant to the appointment of counsel."[40]  The sentence and accompanying footnote that follow the *Weeks* citation, however, indicate that a petitioner has to offer some arguable evidence to support an *Atkins* claim.

The majority correctly understands that AEDPA is meant "to curb the vast number of habeas filings in the federal courts."  It also rightly observes that it should "withhold § 848(q)(4)(B) counsel for certification proceedings absent some colorable showing by the prisoner that he is, in fact, entitled to habeas relief."  *Id*. Something "colorable" "appear[s] to be true, valid, or right." BLACK'S LAW DICTIONARY (7th ed. 1999).  As shown, *infra*, Hearn has offered no evidence that satisfies the "colorable claim" standard.

The majority has fashioned a new evidentiary standard, then

---

[40] *See also Barnard v. Collins*, 13 F.3d 871, 879 (5th Cir. 1994).

has craftily viewed Hearn's evidence as satisfying that standard. The result, effectively, is that *any* petitionerSSregardless of the procedural defaults or the inadequacy of offered evidenceSSmay receive an attorney to pursue an *Atkins* claim. He needs only to file a petition containing the magic words "mental retardation" and to include some evidence that he underachieved at some point early in life. In oral argument, Hearn's counsel admitted that he wished for such a ruling from this court.

Indeed, the panel majority has given counsel pretty much everything he has asked for. The majority describes the "colorable showing of mental retardation" standard as a "modest evidentiary threshold." Indeed, if Hearn's proffered "evidence" is deemed sufficient, the majority's standard is no real threshold at all; the mere mention of slowness in school, or poor grades, triggers the right to a panoply of rights, including counsel and other assistance.

The majority has attempted to moderate the effect of this ruling by creating the "colorable showing" requirement. The paucity of Hearn's evidence, however, suggests that, in reality, almost every prisoner will meet that threshold.[41]

In Texas, a party suffers from mental retardation if he sat-

---

[41] Additionally, neither the majority nor the concurrence remotely addresses the fact that Hearn filed his request for an attorney a scant two days before his long-scheduled execution. Obviously if Hearn knew of his claim and believedSSbased on his anemic evidenceSSthat it was valid, he could have filed something weeks earlier.

isfies three requirements.[42]  First, he must exhibit "'significantly subaverage general intellectual functioning' (an IQ of about 70 or below)[.]"[43]  Secondly, he must have "'related limitations in adaptive functioning.'"[44]  Finally, both the intelligence and adaptation problems must have manifested themselves before age eighteen.[45]

1.

Although the majority quotes these three requirements,[46] it focuses almost entirely on the intelligence prong.  The majority's evidence, in summary, is this:  Hearn performed poorly in school. He failed first grade, he regularly did not succeed in his classes, and he placed 174th out of 200 students in the tenth grade.  The majority does not note that Hearn regularly performed well in some classes.  In some semesters, he passed every course.[47]

One might attribute some of Hearn's worst grades to apparent

---

[42] *Hall v. State*, No. 73,787, 2004 Tex. Crim. App. LEXIS 817, at *32 (Tex. Crim. App. May 5, 2004)

[43] *Id.* (quoting *Ex parte Briseno*, No. 29,819-03, 2004 Tex. Crim. App. LEXIS 199, at *15 (Tex. Crim. App. Feb. 11, 2004)).

[44] *Id.*

[45] *Id.*

[46] In truth, the majority ignores *Hall*'s threshold of sub-par intelligence by stating that a party with "an IQ of approximately 70 to 75 or below" satisfies the first prong.  The person must show "an IQ of about 70 or below."  *Hall*, 2004 Tex. Crim. App. LEXIS 817, at *32.

[47] In the spring of 1994, Hearn passed every class at Horizons Alternative School.  In the spring of 1996, he passed every class but one.

zeroes on a number of final exams.  The zeroes do not represent a calculated number grade but represent some sort of unexcused absence.  The explanation of poor attendance would correlate with Hearn's withdrawal from the tenth grade.  The school district listed his reason for withdrawal as "non-attendance."[48]

Hearn offers nothing to suggest a need for further testing, beyond the opinion of a witness who submitted an affidavit in his behalf but whose lack of a Texas license prevents him from offering any expert testimony in a trial.[49]  That evidence, on which the majority heavily relies, is incompetent as a matter of law and should have been stricken.[50]

That "expert" admits that "the results of the IQ testing . . . indicated an IQ above the cut-off typically associated with mental retardation" and cannot provide any reason to conduct further test-

---

[48] Wanda Bell, who obtained custody of Hearn in 1995, testified in the punishment phase of the trial that Hearn "worked to a certain degree.  I guess, you know, you get moody and you don't want to do what the teachers tell you to do."  Bell also recounted that Hearn stopped attending school in the tenth grade:  "I dropped them off [at school] that morning, and Yokamon didn't come home that evening."  Hearn returned in January of the next year.

[49] Although James Patton has authored a number of books and articles focusing on mental retardation, he cannot, for purposes of a Texas trial, diagnose someone as having mental retardation.  TEX. HEALTH & SAFETY CODE § 591.003(16) (defining "Person with mental retardation" as "a person determined by a physician or psychologist licensed in this state or certified by the department to have subaverage general intellectual functioning with deficits in adaptive behavior").

[50] The majority chides me for relying cumulatively on website hearsay in pointing out that Hearn writes articulately. *See infra*.  This is bizarre in light of the majority's heavySSindeed, almost total reliance on testimony from an "expert" who is not even authorized to render professional opinions in Texas.

ing other than the "gravity of the current situation (i.e., the importance of the decisions that have been made in regard to Mr. Hearn)[.]" Essentially, Hearn's expert would like Hearn to have further tests based not on evidence but on the seriousness of the capital sentence. The expert advances a policy argument that lies outside our properly-understood and limited judicial role.[51]

Furthermore, the one test[52] Hearn *has* taken places his I.Q. at 82. The majority emphasizes the variability inherent in the score and places Hearn's I.Q. somewhere between 70 and 75. Even if Hearn's "real" I.Q. score lies at the remote low ends that the majority has listed,[53] such a score does not satisfy the threshold that Texas has adopted, namely, an I.Q. of *70 or below*. *Hall*, 2004 Tex. Crim. App. LEXIS 817, at *32.

Some scattered evidence suggests that Hearn has, at the least, an adequate level of intelligence. He wrote a coherent and lengthy request for clemency to the Texas Board of Pardons and Paroles: "My Execution date is set for March 4, 2004. And I am trying to

---

[51] The concurrence makes the amazing statement that requiring a petitioner to shoulder the burden of offering sufficient evidence to justify equitable tolling is a "backwards" approach. Apparently, by that logic, offering an inadmissible statement from someone who offers no reason, beyond the gravity of the death sentence, to conduct further investigation places the burden on the state to *disprove* Hearn's claims. That theory, in fact, stands the burden of proof on its head; the burden to obtain a stay is always on the petitioner, not the respondent.

[52] Upon entering state custody, Hearn took the Weschler Adult Intelligence Scale-Revised ("WAIS-R") Short-Form test, which serves a screening function to help determine whether an inmate warrants additional treatment or counseling.

[53] Of course, Hearn's "real" I.Q. could also lie at the *high* end of the purported variability.

get the help of you ladies and gentlemen in getting my sentence commuted to life." He submitted a long, personalized request for a pen pan via a web site. In the request, he used complete sentences and told the reader he "enjoy[s] reading novels (horror, Western, Suspense) [and] doing drawings."[54]

Neither the majority nor Hearn has made an arguable showing that Hearn has the degree of sub-par intelligence associated with mental retardation. Although he certainly did not achieve the greatest educational success, he did not languish in the public school system. At times, he performed well; at other times, it appears that he did not attend class with sufficient regularity to achieve a laudable score. He had ample chance to provide greater details regarding his educational problems but has not presented any information beyond a list that includes some unimpressive grades.

To hold that a few poor grades constitute a "colorable showing" of mental retardation gives no limiting principle and offers no guidance to district courts who will entertain similar claims. Undoubtedly, almost every individual sentenced to death will have shown, at some point in his life, some underachieving or deviant behavior.

We have an obligation to set some sort of meaningful eviden-

---

[54] Voices From Inside, http://www.alive-abolish-deathpenalty.org/death_penalty/voices_tx_hearn.htm (visited June 8, 2004).

tiary threshold and to articulate fairly transparent criteria for satisfying that mark.  The majority's decision to accept some bad grades as satisfactory evidence of sub-par intelligence does not meet that obligation and invites standardless review.[55]

2.

The majority also errs in deciding that Hearn has satisfied the second prong of the Texas definition of mental retardation. Though a party must prove all three prongs, the majority merely winks at the adaptive-functioning prong:[56]  "H[earn] further cites the trial testimony of a family member to demonstrate his compromised social skills."  The majority offers nothing else.  With respect to the family member, an aunt[57] of Hearn's named Wanda Bell, the majority notes only that she "testified that he was a 'follower' who tended to be 'influenced by the wrong type of people,' and that when he left home at age 18, she was still 'concerned [sic] about if he was being taken care of.'"

---

[55] If slowness in school is enough to meet the requirements of *McFarland*, a large percentage of death row inmates will be entitled to virtually automatic stays as a result of the majority's action in this case.  That may be an unintended result, but it is a very real one.

[56] The majority does not even discuss the third prong.  Hearn has not cited a specific or even general time when his alleged retardation began.  He was, however, below the age of eighteen during the time during which evidence of his mental retardation allegedly appeared.  If the school records satisfy the first prong of mental retardation, Hearn presumably  will satisfy the third prong, as well.

[57] Bell received permanent custody of Hearn beginning in 1995.

In making such a statement, Bell may well have described a large proportion of American teenagers. Although her testimony may reflect genuine concern regarding Hearn, it cannot possibly, on its own, reasonably lead to the conclusion that Hearn has problems with adaptive functioning. The majority's reliance on Bell's statement, however, conflicts with two other matters relating to her. First, the family court that awarded permanent custody to Bell noted that, after Hearn stayed with Bell permanently, "[h]e followed all the rules and did quite well in school." Hearn responded positively to a functional, stable home.

Secondly, Bell's testimony in the punishment phase of Hearn's trial indicates that Hearn understood right from wrong, could succeed when he applied himself, and possessed the ability to live on his own. As part of her testimony, Bell stated that "[w]ell when [Hearn] applied hisself [sic]. HeSShe wasSShe's good head on him and, you know, when you apply yourself to your studies, you do well." Bell responded "Yes" to the question "if he would work, he could do okay?" Bell twice affirmed that Hearn "knew right from wrong" by age seventeen. She noted that Hearn left her care when he turned eighteen and apparently took care of himself adequately during that time.

Furthermore, the majority's lone citation to Bell's testimony is somewhat out of context. Bell did not attribute Hearn's desire to follow others to a mental defect, but instead to a desire to

43

compensate for his poor socioeconomic standing: "It's just like kids develop this when they're⁣SSsome kids, when they're young. They're not proud of the environment that they're in." Bell did not suggest that Hearn possessed any kind of adaptive problem.

Additionally, the facts of the crime suggest that Hearn functioned rather well with others. He participated in the carjacking and shooting of an individual. Testimony and evidence showed that he drove the victim's car to an isolated area and shot the victim in the head multiple times. He bragged of his exploits and provided details of the killing to three others not associated in the crime.

Hearn also understood that he needed to dispose of the evidence to avoid prosecution. Two witnesses testified that he asked about where to locate a "chop shop" to dispose of the victim's car. When the police questioned him, he provided a coherent but false explanation as to how his fingerprints appeared on the victim's car's steering wheel. Hearn functioned well enough to kidnap a man, drive a stolen car, shoot a victim multiple times, brag about his exploits, and create an untruthful, exculpatory story. If Hearn had not functioned so well, the victim would not have died. Thus, the majority's lone citation to one statement from a relative cannot possibly satisfy the adaptive-functioning prong of mental retardation.

44

# III.

Thus, in its apparent zeal to grant Hearn an attorney and a stay of execution,[58] the majority neglects and unpersuasively responds to two significant problems that are fatal to its spirited position. First, it cannot factually distinguish, and cannot logically dismiss as *dictum*, the binding language of *Kutzner* that forecloses the application of *McFarland* to successive habeas petitions.

Secondly, the one-year statute of limitations bars Hearn's application. The majority has apparently lowered the standard of "rare and exceptional" circumstances required to grant equitable tolling so that anyone may obtain an attorney, at any stage of litigation, by simply claiming mental retardation. Hearn, and the majority on his behalf, offer a dearth of evidence to suggest that Hearn has satisfied any of the three prongs of Texas's definition of mental retardation.

Without precedential basis, a supportive statute of limitations, or evidence justifying equitable tolling, the panel must rely on good intentions and an unreasonably generous reading of everything that Hearn has alleged and submitted. The majority opinion brings this panel squarely in conflict with binding precedent and does not assist district courts in considering the similar

---

[58] Because Hearn should not be appointed an attorney, I likewise dissent from the majority's stay of execution.

claims that will undoubtedly follow from this opinion.  I respect-

fully dissent.