**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
January 30, 2012

Lyle W. Cayce
Clerk

No. 11-70006

YOKAMON LANEAL HEARN,

Petitioner - Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, SMITH, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Yokamon Laneal Hearn was charged in Texas state court with the murder of Joseph Franklin Meziere. A jury found Hearn guilty of murder committed in the course of a kidnapping and robbery—a capital offense—and the state court sentenced him to death based on the jury's verdict on the two special issues at sentencing. Hearn petitioned unsuccessfully for post-conviction relief in state court and his initial federal habeas petition in federal district court was dismissed. However, on the basis of the Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), Hearn was eventually authorized to bring a

No. 11-70006

successive habeas petition to assert a mental retardation claim. The district court dismissed the successive habeas petition and sua sponte declined to issue a certificate of appealability ("COA"). Hearn has filed an application for a COA to this court on one issue: whether the Texas Court of Criminal Appeals ("CCA") unreasonably applied federal law as established in *Atkins* when it refused to allow Hearn to wholly replace full-scale IQ scores with a clinical assessment to establish his claim of mental retardation.

Because the CCA's decision was not an unreasonable application of federal law, we deny Hearn's application.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The details of the murder giving rise to this case and the lengthy procedural history are accurately recited in opinions by the CCA, *Hearn v. State*, No. 73,371 (Tex. Crim. App. Oct. 3, 2001) (per curiam) (unpublished), *Ex parte Hearn*, 310 S.W.3d 424, 426–27 (Tex. Crim. App. 2010), and the federal district court, *Hearn v. Thaler*, No. 3:04-CV-0450, 2011 WL 825744, at *1 (N.D. Tex. Mar. 3, 2011).

Hearn and three accomplices abducted Joseph Franklin Meziere from a self-service car wash in March 1998. They took Meziere's car and drove him to a remote location where Hearn killed Meziere by shooting him several times in the head at close range. A jury found Hearn guilty of capital murder and he was sentenced to death by the trial court. The CCA affirmed his conviction and sentence, *Hearn v. State*, No. 73,371 (Tex. Crim. App. Oct. 3, 2001) (per curiam) (unpublished), and certiorari was denied. *Hearn v. Texas*, 535 U.S. 991 (2002).

While his direct appeal was pending, Hearn filed state and federal habeas corpus petitions, both of which were denied. *Ex parte Hearn*, WR-50, 116-01 (Tex. Crim. App. Nov. 14, 2001); *Hearn v. Cockrell*, No. 3:01-CV-2551, 2002 WL 1544815 (N.D. Tex. July 11, 2002); *Hearn v. Dretke*, 73 F. App'x 79 (5th Cir. 2003). The Supreme Court again denied Hearn's petition for writ of certiorari.

No. 11-70006

*Hearn v. Dretke*, 540 U.S. 1022 (2003). Hearn's execution was subsequently scheduled for March 4, 2004.

On the eve of his scheduled execution, this court stayed the execution, granted Hearn's motion for appointment of counsel to investigate his claim of mental retardation under *Atkins*, and remanded to the district court for consideration of a successive habeas petition to present his *Atkins* claim. *In re Hearn*, 376 F.3d 447, 457–58 (5th Cir. 2004), *clarified and reh'g denied*, 389 F.3d 122 (5th Cir. 2004). After additional factual development on Hearn's *Atkins* claim, his successive habeas petition was authorized in July 2005. *In re Hearn*, 418 F.3d 444, 448 (5th Cir. 2005) ("*Hearn I*").

Once Hearn's successive habeas petition was authorized, the district court conducted an evidentiary hearing on Hearn's *Atkins* claim. The district court initially found that Hearn had failed to make the prima facie showing of mental retardation and dismissed his successive petition with prejudice without reaching the merits. *Hearn v. Quarterman*, No. 3:04-CV-0450, 2007 WL 2809908 (N.D. Tex. Sept. 27, 2007) ("*Hearn II*") (applying 28 U.S.C. § 2244(b)). The court later allowed additional briefing, *Hearn v. Quarterman*, No. 3:04-CV-0450, 2008 WL 679030 (N.D. Tex. Mar. 13, 2008) ("*Hearn III*"), and eventually granted Hearn's Fed. R. Civ. P. 59(e) motion to alter or amend the judgment due to the intervening opinion in *Hall v. Quarterman*, 534 F.3d 365 (5th Cir. 2008) (per curiam), finding that Hearn had made a prima facie showing of mental retardation under *Atkins*. *Hearn v. Quarterman*, No. 3:04-CV-0450, 2008 WL 3362041, at *7 (N.D. Tex. Aug. 12, 2008) ("*Hearn IV*"). The court also granted a stay and abatement to permit Hearn to exhaust his *Atkins* claim in state court in the first instance pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005). *Hearn IV* at *4–6.

With the federal proceedings stayed, Hearn returned to state court and presented his *Atkins* claim. The state trial court forwarded Hearn's state habeas

3

application to the CCA to determine whether Hearn's *Atkins* claim had merit. Hearn's argument before the CCA focused on the use of IQ scores as a defining characteristic of mental retardation. In light of the Supreme Court's direction in *Atkins*, which "le[ft] to the States the task of developing appropriate ways to enforce the constitutional restriction" against executing mentally retarded persons, 536 U.S. at 317, the CCA previously announced that "[u]ntil the Texas Legislature provides an alternate statutory definition of 'mental retardation,' . . . we will follow the AAMR [American Association of Mental Retardation] or section 591.003(13) of the Texas Health and Safety Code criteria in addressing *Atkins* mental retardation claims." *Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004).

The AAMR relied upon by the CCA defines mental retardation by three characteristics: "(1) 'significantly subaverage' general intellectual functioning; (2) accompanied by 'related' limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." *Briseno*, 135 S.W.3d at 7 (citing AMERICAN PSYCHIATRIC ASSOCIATION DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (Text Revision, 4th ed. 2000) (DSM–IV), AMERICAN ASSOCIATION ON MENTAL DEFICIENCY (AAMD), CLASSIFICATION IN MENTAL RETARDATION N 1 (Grossman ed.1983), and AAMR, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORT (9th ed.1992)). Similarly, the Texas Health and Safety Code defines mental retardation as "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." TEX. HEALTH & SAFETY CODE § 591.003(7-a), (13). Under these definitions, "significantly subaverage general intellectual functioning" has been defined as the individual's having an IQ of about 70 or below, which is approximately two standard deviations below the mean. *Briseno*, 135 S.W.3d at 7 n.24 (citing DSM–IV and AAMD). The medical authorities cited by the court in *Briseno* also noted:

> Psychologists and other mental health professionals are flexible in their assessment of mental retardation; thus, sometimes a person whose IQ has tested above 70 may be diagnosed as mentally retarded while a person whose IQ tests below 70 may not be mentally retarded.

*Id.* (citing AAMD). While a full-scale IQ score of 70 or below is generally acknowledged as the defining point for subaverage intellectual functioning, there can be measurement error of approximately five points in either direction when assessing IQ, depending on the testing instrument. *Ex parte Hearn*, 310 S.W.3d 424, 428 (Tex. Crim. App. 2010), *cert. denied*, 543 U.S. 960 (2010); *see also Atkins*, 536 U.S. at 309 n.5 ("It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." (citing 2 COMPREHENSIVE TEXTBOOK OF PSYCHIATRY 2952 (B. Sadock & V. Sadock eds. 7th ed. 2000))).

Hearn's argument to the CCA challenged this use of IQ scores in making a determination of mental retardation. In 2005, psychologist Dr. Alice Conroy administered a WAIS–III IQ test to Hearn which resulted in a full-scale IQ score of 74—potentially within the five point margin of error. Another defense expert testifying on behalf of Hearn, Dr. James Patton, concluded that Hearn's full scale IQ score of 74 was within the standard error of measurement and therefore could meet the requirement of significant subaverage intellectual functioning. *Hearn*, 310 S.W.3d at 429.

However, three additional tests estimated Hearn's IQ to be substantially higher. A 1999 WAIS-R short-form test administered by the Texas Department of Criminal Justice estimated Hearn's full-scale IQ to be 82. Two other tests administered by state experts in January 2007, a WAIS-III test and a Stanford-Binet Intelligence Scales (5th ed.) test, estimated Hearn's IQ to be 88 and 93 respectively. *Id.*

No. 11-70006

Hearn argued however that the tests showing his IQ to be well above the clinical cutoff for mental retardation did not fully reflect his actual mental functioning. To support this argument, Hearn produced two additional experts, Dr. Dale Watson and Dr. Stephen Greenspan. *Id.* at 430. Dr. Watson reviewed the previous test results and administered an additional IQ test using the Woodcock Johnson Test of Cognitive Abilities (3d ed.). The Woodcock Johnson test resulted in a full-scale IQ score of 87 but Dr. Watson noted deficits in adaptive behavior. Because he believed there were inconsistencies between Hearn's full-scale IQ scores, which were above the range for mental retardation, and the observed adaptive behavior deficits, Dr. Watson administered a neuropsychological test battery. *Id.* From the test, "Dr. Watson concluded that [Hearn's] neuropsychological deficits 'appear' to underlie previous findings of deficits in adaptive functions, and are 'likely' developmental in nature." *Id.*

Based on the neuropsychological deficits identified by Dr. Watson, Dr. Greenspan testified as to whether the deficits exhibited by Hearn "could satisfy the requirement of significantly subaverage general intellectual functioning, despite full-scale IQ scores ranging from 87 to 93." *Id.* Based in part on an ancillary finding by another doctor that Hearn suffers from Fetal Alcohol Syndrome, Dr. Greenspan opined that substituting neuropsychological measures for full-scale IQ scores could be justified when there is a complicating medical diagnosis such as Fetal Alcohol Spectrum Disorder because such conditions can cause a mixed pattern of intellectual impairments that, "while just as serious and handicapping as those found in people with a diagnosis of MR, are not adequately summarized" by full-scale IQ scores. *Id.* Dr. Greenspan concluded that Hearn could establish a mental-retardation claim under a more expansive definition of mental retardation. *Id.* Hearn therefore argued that the court should find him to be mentally retarded, relying on the opinions of Drs. Patton,

No. 11-70006

Watson, and Greenspan, despite the results of the IQ tests that placed him above the commonly accepted mental retardation threshold. *Id.*

The CCA applied *Atkins* and denied his claim on the merits, holding that Hearn had not established that he was mentally retarded. *Id.* at 430–31. In denying his claim, the CCA rejected Hearn's "attempts to use neuropsychological measures to wholly replace full-scale IQ scores in measuring intellectual functioning." *Id.* at 431. While recognizing that habeas applicants should be given the opportunity to present clinical assessment evidence to demonstrate why their full-scale IQ scores were within the margin of error for standardized IQ testing, the court held that "applicants may not use clinical assessment as a replacement for full-scale IQ scores in measuring intellectual functioning." *Id.* Because Hearn's evidence did not demonstrate significantly subaverage intellectual functioning, the CCA denied his application. *Id.*

Following the CCA's denial of his application, Hearn returned to the federal district court seeking habeas relief for his now-exhausted *Atkins* claim under 28 U.S.C. § 2254. *Hearn v. Thaler*, No. 3:04-CV-0450, 2011 WL 825744 (N.D. Tex. Mar. 3, 2011) ("*Hearn V*"). Hearn argued that the CCA decision refusing to substitute clinical assessment evidence for full-scale IQ scores was contrary to and an unreasonable application of clearly established federal law under *Atkins*. *Id.* at *1, 3. The district court denied Hearn's petition, explaining that the CCA "has done nothing more than perform the task left open to it by *Atkins*" by exercising the state's authority to prescribe what evidence can be considered when determining mental retardation. *Id.* at *4. Moreover, because the Supreme Court has not clearly established any precise boundaries on the state's limits for determining mental retardation, "the CCA's decision in Hearn's case could not have been an unreasonable application of *Atkins*." *Id.* Finally, the district court sua sponte denied Hearn a COA, finding that reasonable jurists

would not disagree with the court's assessment of Hearn's constitutional claims. *Id.* This timely application for a COA followed.

## II. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petitioner can appeal a district court's dismissal of a habeas petition only if the district or appellate court issues a COA. 28 U.S.C. § 2253(c); *see also Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003). Because the district court sua sponte declined to issue a COA, Hearn must request a COA from this court to obtain further review of his claim. *See* 28 U.S.C. § 2253(c); *see also Coleman v. Quarterman*, 456 F.3d 537, 541 (5th Cir. 2006).

To obtain a COA under § 2253(c), Hearn must make "a substantial showing of the denial of a constitutional right" by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). At this stage, our inquiry "is a threshold inquiry only, and does not require full consideration of the factual and legal bases of [Hearn's] claim." *Neville v. Dretke*, 423 F.3d 474, 482 (5th Cir. 2005). Because Hearn was sentenced to death, "we must resolve any doubts as to whether a COA should issue in his favor." *Martinez v. Dretke*, 404 F.3d 878, 884 (5th Cir. 2005).

In determining whether reasonable jurists would debate the district court's assessment of Hearn's *Atkins* claim, we keep in mind that the district court's review of the CCA's decision must be conducted pursuant to AEDPA's highly deferential standards. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *see also Leal v. Dretke*, 428 F.3d 543, 548 (5th Cir. 2005). AEDPA permits a federal district court to grant habeas relief from a state court decision only on two bases: (1) if it determines that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) if it determines the

state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). The state court's findings of fact are entitled to a presumption of correctness and the petitioner may overcome that presumption only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Furthermore, the Supreme Court has explained that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Renico v. Lett*, --- U.S. ----, 130 S.Ct. 1855, 1862 (2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).  Under this standard, a federal court may not issue a habeas writ simply because the court concludes the state court incorrectly applied federal law; instead, the state court's application of the law must be "objectively unreasonable." *Id.* "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Id.* (internal citations and quotations omitted).

### III. ANALYSIS

Hearn argues in his COA application that the CCA unreasonably applied federal law as defined in *Atkins* by establishing an "inflexible rule" when it held that "while applicants should be given the opportunity to present clinical assessment to demonstrate why his or her full-scale IQ score is within that margin of error [for standardized IQ testing of intellectual functioning], applicants may not use clinical assessment as a replacement for full-scale IQ scores in measuring intellectual functioning." *Hearn*, 310 S.W.3d at 431.  We disagree.

In denying Hearn's habeas petition, the district court faithfully adhered to AEDPA's deferential standard by finding that the "CCA has done nothing more than perform the task left open to it by *Atkins*." *Hearn V* at *4. That is, the CCA in *Ex parte Briseno* and *Hearn v. Thaler* has undertaken the task "le[ft] to

No. 11-70006

the States . . . of developing appropriate ways to enforce the constitutional restriction" against imposing the death penalty on mentally retarded defendants. *Atkins*, 536 U.S. at 317. This corresponds with the Supreme Court's acknowledgment that its opinion in *Atkins* "did not provide definitive procedural or substantive guides" for determining when a defendant is mentally retarded. *Bobby v. Bies*, 556 U.S. 825, 129 S. Ct. 2145, 2150 (2009) (noting that the Ohio Supreme Court had announced "a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70") (quoting *State v. Lott*, 779 N.E.2d 1011, 1014 (Ohio, 2002)).

Additionally, as reasoned by the district court, the CCA's decision could not have been an unreasonable application of *Atkins* because the Supreme Court has not clearly established the precise boundaries of determining mental retardation. When the Supreme Court refuses to provide a specific rule, "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance*, 556 U.S. 111, 129 S. Ct. 1411, 1419 (2009) (internal quotation marks omitted).

Moreover, this court's binding precedent states that because "the Court in *Atkins* explicitly stated that it left 'to the States the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences' . . . it would be wholly inappropriate for this court, by judicial fiat, to tell the States how to conduct an inquiry into a defendant's mental retardation." *In re Johnson*, 334 F.3d 403, 405 (5th Cir. 2003) (citations omitted). Accordingly, without further instruction from the Supreme Court, we once again decline to tell the state of Texas how to conduct its inquiry into a defendant's mental retardation.

No. 11-70006

Hearn's arguments that the CCA's decision is inflexible and could introduce a significant risk that individuals, such as he, might be subjected to the death penalty in violation of *Atkins* are not persuasive.

First, the CCA's decision is not as inflexible as Hearn attempts to portray it. While Hearn attempts to portray the CCA's decision as an absolute bar to a finding of mental retardation when a defendant's full-scale IQ is higher than 75, that is not a wholly accurate statement of the CCA's holding. Instead, the CCA holding was far more nuanced as it pertains to the facts in Hearn's case. The court first noted that it had "expressly declined to establish a 'mental retardation' bright-line exemption from execution without 'significantly greater assistance from the [] legislature." *Hearn*, 310 S.W.3d at 430 (citing *Briseno*, 135 S.W.3d at 6). The court then explained that "*[i]n the present case*, applicant attempts to use neuropsychological measures to wholly replace full-scale IQ scores in measuring intellectual functioning." *Id.* at 431 (emphasis added). The court then concluded, in light of prior decisions and the facts in Hearn's case, that "applicants may not use clinical assessment as a replacement for full-scale IQ scores in measuring intellectual functioning." *Id.* The key is in the context of the CCA's decision. It reviewed the facts, notably that Hearn had at least three full-scale IQ scores that were well above the clinically accepted threshold for a mental retardation diagnosis, and subsequently refused to accept Hearn's argument that it should ignore those test results in favor of a separate clinical assessment. Under AEDPA, neither the district court nor this court is in a position to second-guess the state court's decision in light of the guidance in *Atkins*. *See also Chester v. Thaler*, No. 08-70023, 2011 U.S. App. LEXIS 26077, at *23–25 (5th Cir. Dec. 30, 2011).

Second, we do not perceive the significant risk of possible future constitutional violations argued by Hearn. While Hearn urges this court to be mindful of the consistent application of the death penalty in light of the Supreme

11

No. 11-70006

Court's language in *Wainwright*, Hearn's own prior statements betray his argument that the CCA's decision will result in inconsistent imposition of the death penalty to others in the future that might be in a similar position. The rule established in *Atkins* specifically prohibits the imposition of the death penalty on mentally retarded defendants.  However, Hearn argued to the district court that he has a disability due to impairments in brain functioning that affect him *in the same way* as mental retardation.  As far back as 2007, Hearn has also admitted that "under the prevailing [AAMR] definition of mental retardation, he does not have mental retardation." Thus, Hearn, or those potentially like him in the future, cannot claim the benefit of *Atkins* because they do not fit within the clinically accepted definition of mental retardation.

Furthermore, Hearn's argued approach of allowing individualized neuropsychological evaluations to wholly replace full-scale IQ tests would result in more inconsistent determinations of mental retardation, not less. Dr. Greenspan's position exemplifies this potential inconsistency.  While acknowledging that Texas' definition of mental retardation is widely accepted and non-controversial, he nonetheless argued that Hearn could establish a mental retardation claim under a more expansive definition of mental retardation.  Dr. Greenspan also acknowledged that he hoped the court would change its operational criteria to adopt a definition of mental retardation he believes is more inclusive than the current clinical definition.

Adopting Hearn's argued approach would only invite additional such testimony in future cases and, considering the variability and subjective nature of such testimony, it strikes us as implausible that opening the door for courts to rely on such testimony as a wholesale replacement for full-scale IQ test results would result in more consistent mental retardation determinations. Instead, the CCA's approach of relying primarily on the full-scale IQ tests used here is reasonable and more likely to result in consistent mental retardation

determinations because the tests have been widely acknowledged as "the standard instrument in the United States for assessing intellectual functioning." *Atkins*, 536 U.S. at 309 n.5; *see also Rivera v. Quarterman*, 505 F.3d 349, 361 (5th Cir. 2007) (describing the WAIS-III IQ test as "the best full-scale IQ test available in English").

In summary, considering that the Supreme Court has delegated to the states the responsibility of developing appropriate ways to enforce the constitutional restriction against executing mentally retarded defendants, we cannot second-guess the CCA's decision. Were this court to hold that the CCA's decision was an unreasonable application of federal law under *Atkins*, we would be requiring the state court to substantially alter its established rule despite the Supreme Court's delegation of such rulemaking to the state. This is precisely what a federal court reviewing a state court decision under AEDPA's deferential standard cannot do in the absence of an unreasonable application of a clearly established federal law as defined by the Supreme Court.

## IV. CONCLUSION

For the foregoing reasons, Hearn's COA application is DENIED.