# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 15-70001

United States Court of Appeals
Fifth Circuit

**FILED**
June 9, 2015

Lyle W. Cayce
Clerk

JAMES GARRETT FREEMAN,

       Petitioner–Appellant,

versus

WILLIAM STEPHENS, Director,
  Texas Department of Criminal Justice, Correctional Institutions Division,

       Respondent–Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:12-CV-3784

Before SMITH, ELROD, and HIGGINSON, Circuit Judges.

JERRY E. SMITH, Circuit Judge:*

James Freeman seeks a certificate of appealability ("COA") to challenge the denial of federal habeas corpus relief on his claim of ineffective assistance of counsel ("IAC"). The district court denied the habeas petition on the merits,

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## No. 15-70001

concluding that the state habeas court reasonably held that Freeman had failed to satisfy either prong of his IAC claim. Because reasonable jurists could not debate whether Freeman's petition should have been resolved differently or that the issue deserves encouragement to proceed further, we deny a COA.

### I.

### A.

The Texas Court of Criminal Appeals ("CCA") set out the basic facts in its opinion affirming Freeman's conviction and sentence.[1]  In brief, when a game warden attempted to pull Freeman over, suspecting that he had discharged a gun from his truck, Freeman fled and led officers on a ninety-minute high-speed chase.  After Freeman's truck was finally disabled from running over a spike strip, he emerged firing a handgun at officers, emptying the magazine as he used his vehicle for cover.  Officers returned fire, and Freeman reemerged shooting an AK-47 assault rifle.  As a second warden attempted to return fire, Freeman shot and killed him.  The shootout was captured on video by one officer's dashboard camera.  Freeman ran and was apprehended.

### B.

Freeman hired two experienced criminal defense attorneys, Stanley Schneider and Lee Cox.  According to the state court, Schneider had "an excellent reputation" and "had previous capital murder trial and appellate experience."  For the liability phase, their strategy was to argue that Freeman had not intended to kill anyone but was depressed and suicidal and had fled and shot in the officers' direction to induce them to shoot and kill him in return—

---

[1] *Freeman v. State*, 340 S.W.3d 717, 721–22 (Tex. Crim. App. 2011), *cert. denied*, 132 S. Ct. 1099 (2012).

suicide by cop.[2]   In preparation, defense counsel hired a mitigation investigator, Gerald Byington, and three psychological experts: Dr. Jerome Brown, Dr. Vivian Lord, and Dr. Daneen Milam.

Brown, a licensed clinical psychologist, interviewed Freeman and members of his family, administered psychological tests, and reviewed relevant medical records. Brown testified during the liability phase that, though Freeman did not show signs of personality disorder or mental illness, he was moderately depressed around the time of the shooting and experienced suicidal ideation. Brown stated that those feelings, combined with alcohol abuse, resulted in impulsive and reckless behavior. Thus, in Brown's view, Freeman's shooting at officers was done "without any understanding of the consequences or thinking about the consequences of what he's gotten himself into."

Lord—a former police officer and licensed psychologist with expertise in suicide by cop—also testified for the defense. She interviewed Freeman and his former roommate. She also reviewed other interviews with family and friends and examined records and accounts of the shooting, including the video. Lord testified during the liability phase that, in her assessment, Freeman had a number of indicators that made it possible he was suicidal. She also said that some of Freeman's actions during the chase and shooting were consistent with suicide by cop.

The prosecution cross-examined each expert effectively. Assistant District Attorney Kelly Siegler elicited testimony from Brown that Freeman had anger issues, that he was not significantly depressed, and that he panicked

---

[2] *See* BLACK'S LAW DICTIONARY 1662 (10th ed. 2014) (defining "suicide-by-cop" as "[a] form of suicide in which the suicidal person intentionally engages in life-threatening behavior to induce a police officer to shoot the person"). Under Texas law, an element of capital murder is that the person intentionally or knowingly cause the death of the victim, in this case, a peace officer. TEX. PENAL CODE §§ 19.02(b)(1), 19.03(a)(2).

No. 15-70001

when he fled because he wanted to avoid punishment. Freeman had stated to Brown, "I didn't care. They got shot because I was mad about being shot." Similarly, she questioned Lord's assumptions and the inconsistency of her assessment with regard to Freeman's statements to Brown.

In addition to the experts, defense counsel called four members of Freeman's family and numerous friends, neighbors, and associates, who testified about Freeman's good nature, the recent events that precipitated his depression, and how inconsistent the shooting was with his character. They supported the theory that Freeman's actions were the result of an extreme emotional or psychological break.

Finally, counsel re-urged, during closing arguments, that Freeman did not intend to kill anyone, describing his depression and alcohol abuse and telling the jury that "[Freeman] was reckless. [He] shot in the direction of people. But the State has presented no evidence, no evidence of his intent." The prosecution argued that Freeman had intended to kill the officers to escape punishment and was not suicidal or mentally impaired. The state maintained that Freeman had prepared for a shootout, as evidenced by the guns he had with him. The jury found Freeman guilty of capital murder.

C.

For the punishment phase, defense counsel focused on showing that Freeman was a generally good person and that the crime was an unexpected aberration resulting from depression and difficult circumstances. The defense called over forty witnesses, including family, friends, former teachers, and former employers. All said that he was a generally well-behaved person and student and had no discipline issues. Arresting officers testified that he was cooperative in custody and had no problems while awaiting trial.

4

No. 15-70001

Milam testified as a neuropsychological expert during the punishment phase. She interviewed Freeman and his family and administered a battery of psychological tests. Although the tests showed that Freeman had an average intelligence score and no brain damage, Milam concluded that Freeman had a pattern of clinical depression around the time of the crime and had a history of alcohol abuse. On cross-examination, however, Milam stated that Freeman had scored high on measures of irresponsibility and manipulativeness. The prosecution put on strong evidence of aggravating factors, including that Freeman was about to have his probation revoked for an earlier driving offense and had anger issues.

The jury's answers to the special issues required a death sentence. The court denied a motion for a new trial, and the CCA affirmed the conviction and sentence on direct appeal. *Freeman*, 340 S.W.3d at 734.

D.

Concurrently with the direct appeal, Freeman's new postconviction habeas counsel filed an application with the state trial court, citing, among other grounds, IAC, urging, in essence, that counsel were deficient because they failed sufficiently to investigate Freeman's mental-health background and should have presented a different defense theory. Freeman summarized in his state application that

> a more thorough investigation into [Freeman's] background would have revealed a much more believable and persuasive mitigation theme: inherited predisposition to mental illness and alcoholism combined with chronic exposure to toxic chemicals from infancy into adulthood, the presence of at least 3 mental disorders (Alcohol Dependence, a Neurocognitive Disorder, and either a Major Depressive Disorder or a chronic Dysthymic Disorder), combined with contemporaneous exposure to a combination of Varsol and a moderate amount of alcohol that significantly adversely affected [Freeman's] ability to make rational choices during the incident in question.

No. 15-70001

Freeman's habeas application also maintained that counsel should have developed evidence that Freeman had blacked out during the crime. In support of this IAC claim, Freeman submitted three expert affidavits. Dr. Patricia Perez-Arce stated her opinion that previous head injuries and toxic exposure at his father's welding company had impaired Freeman's mental function and ability to think rationally. Dr. Susan Stone declared her belief—without interviewing Freeman or his family—that the record "raised the possibility" that Freeman had experienced a dissociative period as part of an undiagnosed seizure disorder. Finally, Dr. Robert Smith stated that at the time of the offense Freeman suffered from dysthymic disorder, which is a form of chronic depression, and alcohol dependence.

The same court that presided over Freeman's trial considered his state habeas application and issued findings of fact and conclusions of law. Considering the IAC claim under the two-prong standard announced in *Strickland v. Washington*, 466 U.S. 668 (1984), the state court determined that, for various reasons, Freeman had failed to demonstrate that counsel were ineffective. Among its findings, the court wrote that counsel were experienced criminal attorneys who presented and developed evidence for their theory that Freeman's actions were caused by depression and alcohol dependence, including hiring experts in clinical psychology and suicide by cop. Moreover, the court found that the proposed new evidence was substantially similar to the evidence presented to the jury, and large portions of the expert affidavits were speculative and not credible.

The court concluded that "Freeman's trial attorneys' representation was reasonable and did not fall below an objective standard of professional competence, but rather was within the broad range of reasonable professional assistance." The court declared that neither further investigation by Freeman's

6

No. 15-70001

attorneys nor the presentation of other evidence would have changed the outcome. Thus, it recommended denying relief on the IAC claim. The CCA adopted the trial court's findings and conclusions and denied habeas relief.[3]

Freeman filed a petition seeking federal habeas relief, bringing IAC as his only claim. In a thorough opinion assessing the entire record, the district court denied relief on both prongs of the IAC claim and denied a COA,[4] and Freeman now seeks a COA from this court.

II.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner must obtain a COA to appeal the denial of habeas relief. 28 U.S.C. § 2253(c)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003). Where the district court has denied a COA, we have jurisdiction only to review whether to issue a COA, as distinguished from deciding the ultimate merits. *Miller-El*, 537 U.S. at 336; *Ward v. Stephens*, 777 F.3d 250, 255 (5th Cir. 2015).

In line with 28 U.S.C. § 2253(c), we may issue a COA "only where a petitioner has made a substantial showing of the denial of a constitutional right." *Miller-El*, 537 U.S. at 336 (internal quotation marks omitted). A petitioner meets that standard if he shows "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (internal quotation marks omitted). In judging whether that standard is met,

---

[3] *Ex parte Freeman,* No. WR–76,545–01, 2012 WL 6200490 (Tex. Crim. App. 2012) (unpublished).

[4] *Freeman v. Stephens*, No. 12-3784, 2014 WL 7345737 (S.D. Tex. Dec. 22, 2014).

No. 15-70001

we take an overview and reach a general assessment of the merits. *Ward*, 777 F.3d at 255.

"[T]he determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000). Federal courts may not grant habeas relief from a state court's judgment unless the court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1), (2); *Hearn v. Thaler*, 669 F.3d 265, 271 (5th Cir. 2012). So, the ultimate question is not whether the state court's decision was incorrect, but rather "whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

## III.

### A.

Freeman claims his lawyers were ineffective because they failed adequately to investigate his case and present other mitigating evidence during the liability and punishment phases.[5] We judge his claim under the two-prong standard in *Washington*, 466 U.S. at 687. To make out a successful claim, he must show both (1) that counsel's representation fell below an objective

---

[5] It is not evident from Freeman's supporting brief whether he is making one IAC claim or two—that his counsel were independently ineffective both for failing adequately to investigate and for failing to present other evidence at trial as part of a different strategy. Regardless, we, like the district court, consider his arguments under one analysis because the reasoning is interconnected and, whether taken separately or together, Freeman's IAC claim does not merit relief. *See Trottie v. Stephens*, 720 F.3d 231, 242 n.4 (5th Cir. 2013).

standard of reasonableness and (2) that the deficient performance prejudiced him such that it is reasonably likely, absent the errors, there would have been a different result. *Harrington v. Richter*, 131 S. Ct. 770, 787, 791–92 (2011). We consider counsel's performance deferentially, applying "a strong presumption that counsel's representation [was] within the wide range of reasonable professional assistance." *Id.* at 778 (internal quotation marks omitted).

Meeting both prongs of *Washington*'s "high bar is never an easy task"[6] and is that much more difficult when considered in conjunction with deference under § 2254(d). Combined, courts apply "a doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt."[7]

Defense counsel have an obligation to conduct a reasonably substantial investigation into the facts and potential mitigating evidence.[8] That means that counsel must either "(1) undertake a reasonable investigation or (2) make an informed strategic decision that investigation is unnecessary."[9] In evaluating the investigation's adequacy, courts look to factors such as how counsel prepared for trial, the amount of evidence they had already gathered, and what leads if any they failed to pursue.[10] Yet attorneys may reasonably balance time and limited resources against the utility of further investigation, especially if additional investigation would likely be fruitless or harmful. *Wiggins*, 539 U.S.

---

[6] *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010).

[7] *Ward*, 777 F.3d at 259 (internal quotation marks omitted) (quoting *Burt v. Tillow*, 134 S. Ct. 10, 13 (2013)).

[8] *Rompilla v. Beard*, 545 U.S. 374, 385 (2005); *Neal v. Puckett*, 239 F.3d 683, 688 (5th Cir. 2001).

[9] *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013); *see also Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003).

[10] *Id.* at 527; *Neal*, 239 F.3d at 687–88.

No. 15-70001

at 525. It is the petitioner's obligation to specify what his lawyers failed to find and how it would have changed the outcome. *Trottie*, 720 F.3d at 242–43.

After an investigation, counsel also must make reasonable strategic decisions about how to present the case, including which witnesses and evidence to put forth. *Id.* at 243. If these decisions are made after a thorough investigation, they "are virtually unchallengeable." *Washington*, 466 U.S. at 690. "[A] tactical decision not to pursue and present potential mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable, and therefore does not amount to deficient performance." *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997).

### B.

Freeman avers that his lawyers should have conducted a deeper investigation into the mental-health history of his family, which he claims bolsters his notion that he suffers from depression and possibly other disorders. He further claims that they should have investigated the possibility that his brain was impaired as a result of toxic exposure while working for his father's welding company.

Though counsel did not submit affidavits in state court recounting their efforts at trial, the record shows that they pursued multiple discovery motions, reviewed evidence and conducted independent interviews, and hired multiple experts—including a mitigation investigator—who in turn did their own research and interviews. The psychological experts who interviewed and tested Freeman concluded that he may have been depressed or suicidal, but they also found that he had no brain dysfunction and did not suffer from any serious psychological impairment or personality disorder. His psychological tests were all within normal ranges.

10

No. 15-70001

Freeman's position thus "essentially come[s] down to a matter of degrees," reasoning that his attorneys did not investigate enough. *See Ward*, 777 F.3d at 265. It is almost always true that there was more that counsel could have done in preparation: interviewed more people, requested and reviewed more records, or hired more experts. But that is not the test. Instead, the question is whether, in light of the circumstances, it was an unreasonable professional judgment for the attorneys to stop the investigation where they did. *See Wiggins*, 539 U.S. at 533. Given the expert reports, we cannot conclude that Freeman's attorneys unreasonably failed to pursue a more detailed investigation into possible toxic exposure or mental illness because the circumstances and available information indicated that it would have been unproductive or possibly even harmful.[11]

Nor can we say that Freeman's attorneys' choice of trial strategy was ineffective. This was not defense counsel's first rodeo. Both were seasoned criminal defense attorneys, and Schneider had previous experience trying capital cases. Still, they faced a particularly strong case from the prosecution. Their strategy focused on Freeman's lack of intent and on his good character and lack of future dangerousness. They presented evidence that Freeman had been depressed and dependent on alcohol. Experts testified that Freeman may have been suicidal and did not understand the consequences of his actions. Counsel also presented numerous lay witnesses.

Lawyers have a wide range of possible strategies, and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Richter*, 131 S. Ct. at 788–89 (quoting *Washington*, 466 F.3d at 689).

---

[11] Because evidence of brain injury or organic brain damage is double-edged, a tactical decision not to pursue such evidence as potentially mitigating is objectively reasonable. *Rector*, 120 F.3d at 564; *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002).

No. 15-70001

Because evidence of mental disorder or brain damage is in tension with evidence that Freeman was not a future danger, counsel had to make a tactical choice about which theme to present. The fact that a particular strategy failed does not mean it was unreasonable, and Freeman's attorneys' strategy did not fall outside the wide latitude they have in deciding how best to represent their client. *Ward*, 777 F.3d at 264. As a result, Freeman has not satisfied *Washington*'s first prong.

Moreover, even if the investigation and trial strategy were ineffective, the state court justifiably concluded that Freeman was not prejudiced. Had counsel gathered and presented the evidence that Freeman brought forward in his habeas petition, it is unlikely that his conviction or sentence would have been different when weighed against the state's strong evidence. *See Porter v. McCollum*, 130 S. Ct. 447, 453–54 (2009). The state court found that the proffered evidence in Freeman's habeas application was largely duplicative of what was presented at trial. Defense counsel put on evidence of Freeman's alcohol dependence and depression, and it is unlikely that a more expansive family health history or a diagnosis of dysthymic disorder would have changed how the jury considered it. *See Emery v. Johnson*, 139 F.3d 191, 197 (5th Cir. 1997).

Relatedly, any evidence that Freeman suffered from blackouts or brain dysfunction as a result of toxic exposure is classically double-edged and may have harmed his case rather than helped. Although it may have reduced his culpability in the eyes of the jury, it may also have increased the jury's assessment of future dangerousness. As a result, failure to present that evidence likely did not affect the outcome.[12] Consequently, Freeman has also failed to satisfy the second prong of his IAC claim.

---

[12] *See Johnson*, 306 F.3d at 253; *Dowthitt v. Johnson*, 230 F.3d 733, 745 (5th Cir. 2000).

No. 15-70001

In summary, jurists of reasons could not debate the district court's decision on Freeman's IAC claim under AEDPA. Given the doubly deferential standard, Freeman has failed to demonstrate that he should have succeeded on his *Washington* claim or that it warrants further encouragement. The motion for a COA is DENIED.